Argued December 13, 1963, reversed February 13, 1964

# SCHOOL DIST. NO. 1, MULTNOMAH COUNTY, EX REL THE LYNCH CO. *v.* A. G. RUSHLIGHT & CO. and HAMMOND ET AL

389 P. 2d 338

See also 232 Or. 341, 375 P.2d 411.

*Preston C. Hiefield,* Portland, argued the cause and filed briefs for appellants and cross-respondents.

*William J. Masters,* Portland, argued the cause for respondent and cross-appellant. On the brief were Masters & Masters, Portland.

Before McAllister, Chief Justice, and Rossman, Sloan, Goodwin and Lusk, Justices.

GOODWIN, J.

This is an appeal from a judgment in the sum of $28,987.34, and costs, for a subcontractor in an action brought pursuant to ORS 279.536 on a statutory public-contract bond.

The school district is named on the relation of The Lynch Co., hereinafter referred to as "Lynch", which performed sheet metal work on the John Marshall High School in Portland. The defendants-appellants are Ross B. Hammond Co., the general contractor on the high-school construction, hereinafter referred to as "Hammond," and General Insurance Company of America, Hammond's surety on the performance bond. A. G. Rushlight & Co., the mechanical subcontractor for whom Lynch performed

the work, hereinafter referred to as "Rushlight," is not involved in this appeal. (Judgment in the full amount demanded was entered against Rushlight in a former trial.)

Rushlight received payment from Hammond for the work done on the high school, but Rushlight failed to pay Lynch in full for the portion of that work done by Lynch. The challenged judgment is for the balance left unpaid when Rushlight's funds were exhausted. Hammond and its bonding company defended this action on the ground that Lynch had waived its right to recover against these defendants when it accepted certain payments by Hammond in exchange for a written waiver.

Although many of the facts are in dispute, it is agreed that Lynch, Rushlight, and Hammond executed a number of memoranda between February 6 and April 10, 1961.

For some time Lynch had been supplying labor and materials for another construction project, referred to in the memoranda as the Tektronix assembly buildings. As in the high-school project, Hammond and Rushlight again were the contractor and subcontractor, and Lynch performed a part of Rushlight's subcontract. Because of unpaid claims against Rushlight on the Tektronix buildings (potential sources of liens that could embarrass Hammond), a meeting was called on February 6, 1961, between the three parties at Hammond's office. Rushlight then was apparently in a depleted cash position.

On February 6, 1961, the first memorandum was executed, and a check for $25,000 was paid by Hammond to Lynch pursuant to the terms of the writing. Additional memoranda with similar wording (except for the amount of payment) were signed on Feb-

ruary 8 and 9, on which occasions Lynch received the sums of $40,162.81 and $14,136.90, respectively. The fourth and final such memorandum, again with wording substantially identical to that of the others, was made and executed on April 10, 1961, when Lynch received $15,000 from Hammond. On April 10, 1961, Hammond owed Rushlight $41,563.01 on the Tektronix work, but owed Rushlight nothing further on the high-school construction project. Rushlight, meanwhile, owed Lynch money on both jobs.

Hammond and General Insurance pleaded only the memorandum of April 10, 1961, as an affirmative defense to Lynch's action. It reads:

" AGREEMENT

" April 10, 1961

"In consideration of the promises herein contained A. G. RUSHLIGHT & CO., herein called 'Assignor', ROSS B. HAMMOND CO., herein called 'Hammond', and THE LYNCH COMPANY, INC., herein called 'Assignee', agree as follows:

"Assignor hereby assigns to Assignee Fifteen-Thousand Dollars ($15,000.00) of money now due to Assignor on account of work done by Assignor for Hammond, and hereby authorizes Hammond to pay said sum to Assignee upon execution of this Agreement.

"Hammond consents to said assignment. Assignee accepts the same and hereby waives Assignee's statutory and other rights to file a claim or take other action for labor and/or material furnished by Assignee on or to jobs wherein Assignor has performed work for Hammond.

"For this payment made hereunder by Hammond to Assignee, Assignor shall credit Hammond on account of work performed by Assignor for

Hammond on Tektronix Assembly Buildings #300 and/or #400, and Assignee shall apply such payment only to the payment for labor and/or material furnished by Assignee on or to Tektronix Assembly Buildings #300 and/or #400 subsequent to February 9, 1961.

"This will not require Assignee to perform any of Assignor's obligations to Hammond."

The writing is signed by representatives of each of of the three parties.

In *School Dist. No. 1 v. Rushlight & Co.*, 232 Or 341, 375 P2d 411 (1962), we reversed a judgment of involuntary nonsuit against Lynch and in favor of Hammond and General Insurance Company. The only question then before us concerned the sufficiency of notice under ORS 279.526.

On remand, the cause was tried to a jury. Lynch moved for a directed verdict. The motion was joined in by the defendants. Lynch then sought leave to withdraw its motion. Leave was granted. Lynch reopened the case and put on further testimony. Thereafter the court submitted certain factual issues to the jury. The defendants again moved for a directed verdict. The motions were denied. After a verdict for Lynch against both defendants, there were motions for a judgment n.o.v. and for a new trial. All these motions were denied. These rulings are the foundation for the principal assignments of error.

Lynch has contended throughout this litigation that the defendants were not entitled to rely upon the written instrument as a waiver by Lynch of the right to bring this action. The trial court adopted the first of the grounds alleged by Lynch in avoidance of the waiver, and held that the agreement of April 10, 1961, was not supported by consideration.

In so ruling, the trial court was of the opinion that the waiver was given by Lynch in exchange for payments that Hammond was already bound to make. The record reveals that this was not, however, the fact.

██ While Hammond owed Rushlight some money for work done by Rushlight on the Tektronix project, Rushlight was not entitled to demand payment from Hammond at the time Hammond made the partial payments to Lynch. Further, Hammond was not bound at law to honor Rushlight's partial assignments made without Hammond's consent. See *Bank of Sheridan v. Heider*, 139 Or 185, 195-196, 9 P2d 117 (1932); *Little v. City of Portland*, 26 Or 235, 243, 37 P 911 (1894). Thus, in giving consent and in paying over the funds pursuant thereto Hammond furnished consideration for Lynch's agreement to waive its "statutory and other" remedies. A general contractor's partial payment of one subcontractor's debt to another is consideration for the promise of the party so paid not to file a lien, or, in this case, the public-contract equivalent of a lien.

Since the waiver agreement was supported by consideration, the next question is whether there was any other valid reason why Lynch should not be bound by it.

In addition to the alleged want of consideration, Lynch had pleaded two theories of equitable estoppel. Lynch's reply alleges that to induce Lynch to sign the agreement, Hammond had represented to Lynch falsely (1) that the waiver was merely a receipt for payment and applied only to lien rights against the Tektronix work mentioned therein, and (2) that Rushlight was about to go into bankruptcy and that

unless Lynch signed the waiver Lynch would get no money at all on the Tektronix jobs.

The only one of Lynch's officers who testified was unable to recall any specific representation by Hammond limiting the waiver clause of the memorandum to the Tektronix work. He insisted, however, that he had been led to believe by the entire course of dealings between the parties and by unidentified conversations with the Hammond representatives that the only purpose of the waiver was to protect Hammond against liens on the Tektronix work.

It may be conceded that Lynch was deceived concerning the intended effect of the waivers. There is, however, no evidence linking Hammond in a causal relationship with Lynch's mistake. The memorandum on its face purports to waive Lynch's rights on all jobs. Lynch's witness said he read it.

■ The testimony, even when viewed most favorably for the plaintiff, tends to prove only that Hammond intended the waivers to cover all work Lynch had ever done on any Hammond project, and that Lynch thought the waivers were merely routine forms that applied only to the Tektronix work. This kind of misunderstanding normally falls into the category of unilateral mistake. To charge Hammond with the kind of iniquity necessary to give rise to an estoppel, there must be proof that Hammond's representations caused or encouraged the mistaken belief of Lynch. *Moyer et ux v. Ramseyer et al,* 226 Or 122, 359 P2d 407 (1961). The evidence on this score was nonexistent. Accordingly, the court should not have submitted this theory of estoppel to the jury.

■ The evidence in support of the allegation that Lynch was induced to sign the waiver agreements by Hammond's representations that Rushlight was on

the verge of bankruptcy was directly contradicted by Hammond's denials that any such statement had been made. Lynch's witness swore that he was told that unless Lynch signed the agreements Hammond would disburse no money and Rushlight would take bankruptcy, leaving Lynch with nothing. (We do not need to consider on this point the legal accuracy of such a representation if it was made.) The jury could have believed that such a representation was made. The theoretical existence of a jury question on this point is meaningless, however, unless the representation was false, and was justifiably relied upon. See *State v. Claypool*, 145 Or 615, 620, 28 P2d 882 (1934).

There is no evidence that the representation, if made, was false. For all that appears, Rushlight indeed may have been on the verge of bankruptcy. (The only reason this case is here is because Rushlight has not paid Lynch the judgment recovered against it earlier in this litigation.) Further, there is conclusive evidence that Lynch could not have relied upon any representation by Hammond concerning Rushlight's solvency. Long after any such alleged representations would have been made, Lynch continued to submit bids to Rushlight on other work in which Rushlight was engaged. When asked why he continued to seek subcontracts from Rushlight, the witness said that Lynch was not concerned about Rushlight's ability to pay because Lynch would have lien rights on any work so performed. The witness had been in the building business for many years and said he knew where a lienholder stood in the event of the bankruptcy of a contractor.

If this were a suit to reform a contract entered into under mutual mistake, or induced by fraud, there would have been a failure of proof. The ultimate

issue in this action is whether Lynch has pleaded and proved any valid reason for repudiating a written agreement by which it waived its rights to recover against those secondarily liable. The waiver was given in exchange for cash payments made by a secondary obligor at a time when cash was not available from the primary obligor. There was a failure of proof concerning both the elements of equitable estoppel relied upon. The agreement was, as a matter of law, supported by consideration. There was, accordingly, nothing in this case for the jury to decide.

The directed verdict should have been granted the defendants.

Reversed.