Argued January 11, reversed February 15, 1961

MOYER et ux v. RAMSEYER et al

359 P. 2d 407

*John R. Latourette,* Portland, argued the cause for appellants. On the brief were Latourette & Latourette and Robert P. Dickinson, Portland.

*William T. Hollen,* Newport, argued the cause for respondents. On the brief were Adams, Hollen & Poling, Newport.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, GOODWIN and LUSK, Justices.

GOODWIN, J.

The plaintiffs Moyer appeal from a decree which reformed a contract as prayed in an equitable answer to Moyers' action at law for damages arising out of the defendants Ramseyers' inability to convey certain interests in lands described in a written contract.

The parties will be referred to by their last names. Both parties include husband and wife. Moyer is in the pole and piling business. Mr. Moyer was his own principal witness. Ramseyer is a partial invalid. He was present, but did not testify at the trial. Apparently much of the Ramseyers' part of the transaction was managed by Mrs. Ramseyer, who was their principal witness.

The parties entered into negotiation in August 1953. They executed the contract in litigation on November 19, 1954. Under the terms of the contract, Moyer agreed to buy and Ramseyer agreed to convey, with an insured title, certain described land in Lincoln County for $35,000. The instrument is lengthy and detailed. It shows on its face that the entire agreement of the parties was intended to be expressed in the writing. The details, with one notable exception, appear to have been carefully scrutinized not only by

all the parties but by their several attorneys prior to execution.

The only part of the contract which escaped scrutiny was apparently copied with indifferent accuracy from an earlier option agreement. This was the following legal description:

"The East one half of the Northwest one quarter; the Northeast one quarter of the Southeast one quarter; U. S. Lots 7 and 8 and the West one half of the Northeast one quarter and U. S. Lots 5 and 6, except railroad right of way, all in Section 16, Township 11 South, Range 10 West of the Willamette Meridian, in Lincoln County, Oregon, being in all 289 acres, more or less, with all riparian and booming rights on the Yaquina River upon which the above described land abutts [sic], tide and overflow lands * * *."

The principal issue in the trial court, and here, arose when Moyer tendered the final payment due under the contract. He demanded a warranty deed and title insurance for all the property described in the contract. The Ramseyers then announced that they did not own and could not acquire:

"* * * all riparian and booming rights on the Yaquina River upon which the above described land abutts [sic], tide and overflow lands; * * *."

Moyer, who had made improvements on the land at a cost which he alleged was in excess of $94,000, brought an action for damages for breach of contract. Moyer asserted throughout the trial that the riparian and booming rights, which to him meant the right to raft logs over certain tidal areas of the Yaquina River fronting upon the Ramseyer property, were of the very essence of his agreement to purchase the land for use in his piling business.

The Ramseyers took the position that they had never claimed to own rights extending beyond a legal description of their lands appearing in their original deed. The deed from their grantor described only surveyor's subdivisions, without mentioning the river. Mrs. Ramseyer particularly denied that she ever represented that Ramseyers had any rights to wharf out, drive piling, boom logs, or otherwise make private use of any portion of the stream or the tide flats, if any, which fronted their land. Moyer knew their original deed conveyed no such rights.

Moyer had knowledge of another document, in addition to the Ramseyer deed. A written lease, dated March 10, 1953, between the Ramseyers and one Davis, was examined by Moyer. This instrument described the property substantially as it was described in the original Ramseyer deed, without mentioning the river.

The next document, dated August 12, 1953, is the option agreement previously mentioned. It was drawn by a lawyer in Toledo who did not participate in this case, but who had done some work for the Ramseyers. He had in his office a copy of at least one of the two earlier instruments mentioned, both of which, as we have seen, contained substantially the same legal description. The option agreement was drawn at the request of Moyer, and under his direction, with the telephoned consent of Mrs. Ramseyer. The option was left at Ramseyers' home by Moyer, and in due course it was executed by all parties. This document, for the first time, contained a noteworthy change in the legal description. While it included the identical legal description found in the Davis lease (with a typographical error not material to this controversy), the option also contained these additional words:

"* * * together with all riparian and boom-

ing rights on the Yaquina River upon which the above described land abutts [sic], tide and overflow lands; * * *."

The option agreement, now bearing the expanded legal description, was made subject to the rights of Davis under the aforementioned lease. Moyer having acquired those rights from Davis, the lease is no longer important.

On February 10, 1954, Moyer elected in writing to exercise the option. The written instrument of election again set out the legal description found in the option. In addition to repeating the expanded description, the written notice of election directed specific attention to the legal description by pointing out that a half of a quarter section had been omitted by mistake from the description in the option. The notice asked that the correction be included in the final contract. The Ramseyers did not deny that their attention had been thus directed to the legal description, but Mrs. Ramseyer's reading thereof, by her testimony, was most cursory. Mr. Ramseyer remained silent.

The option provided a preliminary basis for the land-sale contract which was eventually entered into on November 19, 1954. The last-mentioned instrument was supplemented in part by a later agreement which carried forward the description now in controversy, but is not otherwise material to this phase of the case.

Mrs. Ramseyer insisted that the expanded legal description went wholly undetected by the Ramseyers until the time came to perform the contract. Serious doubt was cast upon this evidence, but the trial court could properly have found that the description had been "fattened", as the court put it, without the knowledge of the Ramseyers when they signed the option.

Moyer testified that he had instructed the scrivener to make the addition to the legal description because he was very anxious, as he said, to obtain the river rights necessary to enable him to use the property in his pole and piling business. Moyer said that when he told the scrivener to add the river rights to the description in the option it was his understanding that the rights he desired to obtain were probably already owned by Ramseyer. He swore that he wanted to be certain there would be no question about the rights being included in the future conveyance. Moyer further testified that the matter was fully discussed with Ramseyer after, if not before, the execution of the option and that Moyer's desires and Ramseyer's obligations were fully understood by both parties before the land-sale contract was executed. Mr. Ramseyer did not testify, so Moyer's testimony of conversations with Mr. Ramseyer was never contradicted.

Mrs. Ramseyer denied that the legal description in the option was directly called to her attention. Mrs. Ramseyer swore that she assumed that the lawyer had routinely copied the legal description forward from earlier instruments. Mrs. Ramseyer also denied participating in any conversations with Moyer about ownership of river rights.

Moyer swore that he told both Mr. and Mrs. Ramseyer in effect that if the Ramseyers did not own the rights they should see about acquiring them. This conversation, denied by Mrs. Ramseyer, was after the signing of the option, according to Moyer's testimony. Moyer expressed a belief, which apparently had been nurtured by gossip along the river, that an upland owner could obtain booming and rafting rights in the river by "paying the county a dollar." It later de-

veloped that if any such practice had existed in earlier years, it had long since ceased to exist by 1953.

Ramseyer evidently became curious about the river rights, because the minutes of the Lincoln County Court revealed that he inquired about the matter at the courthouse six days after the option was signed. Ramseyer was informed that the rights were not for sale, but that they could be leased from the county. This evidence was not contradicted.

Parenthetically, it may be noted that the Lincoln County lawyers who participated in the case indicated during the trial that they were aware of the fact that the title to tidelands in what is now Lincoln County, including those of the Yaquina River, frequently caused difficulty. The then Benton County tidelands had been granted in 1874 by the state of Oregon to the Willamette Valley & Coast Railroad. See *Corvallis & Eastern R. Co. v. Benson,* 61 Or 359, 121 P 418. Later, certain tidelands reverted to public ownership. The doubt concerning title to various tidelands in Lincoln County was, as the trial judge observed, "notorious" in the county, if not elsewhere.

When the time came to make a memorandum of the contract contemplated in the option agreement, the Ramseyers engaged the services of Salem attorneys who had no prior knowledge of the property described in the option agreement or of any special facts making the legal description a matter of inquiry. Moyer, in turn, engaged Portland counsel who were equally innocent of the peculiarities of title to tidelands in Lincoln County.

The Salem attorneys proceeded to draft a form of contract which satisfied the Ramseyers, and this draft was submitted to Moyer, who had it reviewed by his counsel in Portland.

If the Ramseyers were in doubt about the legal description contained in the option, they failed to mention the matter to their attorneys during several consultations. They have insisted that the description which found its way into the contract was fraudulently imposed upon them. In any event, the description was carried forward into the contract of November 19, 1954, exactly as Moyer had intended when he had the option prepared. If the Ramseyers had knowledge of the description, the time for them to speak up was at hand.

The testimony revealed that, at one meeting with their attorneys before signing the contract, the Ramseyers had the final draft read and explained to them, point by point. As he read the agreement, however, the attorney testified he did so "omitting the description."

The final draft of this agreement was executed and Moyer went into immediate possession of the premises. Moyer made the payments required under the contract, except the last payment, and made extensive improvements upon the property. He also removed timber of undisclosed value upon making payment therefor as permitted under the contract.

There were at least three pieces of evidence which tended to prove that the Ramseyers knew, before their signatures were placed upon the contract, that the legal description had been "fattened" by Moyer. Six days after the option was signed, Ramseyer inquired at the courthouse about acquiring the rights described in the option. Mrs. Ramseyer wrote in the margin of the option the words and figures "289 acres in the place" immediately next to the portion of the legal description which has produced this litigation. The written notice of election to exercise the option again

directed attention to the legal description by pointing out an omission which admittedly had nothing to do with river rights, but which would put an ordinary person on inquiry with reference to the entire legal description. It should be noted that even this minor correction was not made until the decree below.

Nevertheless, the trial court found that the legal description had been changed without the knowledge of the Ramseyers or their attorneys. The court also found that the Ramseyers had executed the contract while laboring under excusable ignorance of the change. The trial court thereupon decided that Moyer's conduct in procuring the enriched description in the option agreement infected the entire transaction with inequitable conduct which entitled Ramseyers to reformation of the subsequent contract. This view of the matter assumes overreaching or lying in wait by Moyer.

The facts do not sustain such a view. Moyer's moves, while unwise, as it turned out, were open enough. As noted above, the Ramseyers must have known what was in the contract before they signed it.

Between the receipt of Moyer's notice of election to exercise the option in February and the execution of the contract in November, the negotiations of the parties and of their attorneys were exhaustive and at arms length. Moyer made no effort to disguise the legal description in the contract, and, according to his testimony, made frequent reference to the importance he attached to the riparian rights which he thought he would obtain from the Ramseyers. Had the Ramseyers declined to enter into the contract during this period, it is possible that their refusal to go forward could have been justified by the circumstances under which the option was obtained. At all times prior to the execution of the contract, restitution and rescis-

sion might have been appropriate and relatively convenient under the existing option.

After the contract was executed by the parties, however, Moyer went into possession and made extensive improvements. The Ramseyers stood by and observed the expenditures being made by Moyer but said nothing. While estoppel has not been pleaded in this case, and thus is not now before the court, it is nevertheless difficult to understand the studied unconcern displayed by the Ramseyers in light of the facts disclosed by the evidence.

If Moyer had bargained for such title as the Ramseyers might have had in the tidelands, he would have assumed the risk of receiving less than a marketable title. Restatement, 2 Contracts 965, § 502, Illustration 6. But this is not what Moyer agreed to pay $35,000 for. His option was a definite offer. It was accepted under a possible misapprehension. But the option is not the basis of Moyer's action. Subsequent events can not be ignored.

Ramseyers had notice before they signed the contract that Moyer would expect them to produce a marketable title. Their contention that they were tricked into an agreement to sell more than they owned cannot be supported on the facts. As a general proposition, if in fact Moyer had induced the Ramseyers to sign a land-sale contract bearing a description of land which he had insinuated into the agreement by stealth, contrary to the intent of the Ramseyers, then such concealment would be fraud under the definition in Restatement, 2 Contracts 891, § 471.

Before the trial court could allow the Ramseyers to reform the contract because of supposedly unconscionable conduct by Moyer, the ignorance or indifference on the part of the Ramseyers would have

to be excused because induced by fraudulent conceal-
ment. *Hyde v. Kirkpatrick,* 78 Or 466, 153 P 41, 153
P 488.

If the contract had been entered into by mutual
mistake, reformation to accommodate the true under-
standing of the parties might have been available.
*Mass. Protective Ass'n v. Palmer,* 141 Or 688, 18 P2d
585; Restatement, 2 Contracts 968, § 504. Moyer ap-
parently was of the mistaken opinion that the Ram-
seyers could obtain the described river rights when
the time came to perform. The Ramseyers were ap-
parently of the mistaken opinion that the legal de-
scription did not matter. There is nothing mutual in
these misunderstandings except carelessness.

In her testimony, Mrs. Ramseyer failed to give a
satisfactory explanation of this exchange taken from
her earlier deposition:

"Q Did you notice * * * [the legal descrip-
tion] prior to the time that the supplementary
agreement * * * [to that] November 19, 1954
contract was prepared and signed?

"A Yes.

"Q What did you say, if anything to anybody
about it?

"A Nothing.

"Q Why not?

"A It hadn't bothered me. Nobody had wor-
ried about it up to then."

If nobody worried about the legal description
prior to the time for the performance of the contract,
this euphoria was of short duration. When an escrow
reported to Moyer that his tendered final payment
had been declined because the Ramseyers could not
make marketable the title demanded by the contract,
Moyer demanded damages. The Ramseyers demanded

the final payment under the contract as they wanted it to be reformed.

The trial court, in finding that the equities were with Ramseyers, granted reformation and foreclosure of the contract as reformed upon the refusal of Moyer to make the final payment without an insured title. The property was sold on execution, Ramseyers bidding it in for the amount of their lien. The record shows that Ramseyers retained the $25,000 paid on the contract, the land, and all of Moyer's improvements thereon. Moyer received merely the benefit of an undisclosed amount of timber he had removed from the land pursuant to the payment schedule of the contract.

In granting reformation, the trial court made a new contract for the parties. The decree which reformed the contract required Ramseyers to convey the property described in their original deed, together with:

> "* * * all grantors' riparian and booming rights, *if any,* on the Yaquina River upon which the land above described as Parcel I abuts, and all grantors' right, title and interest, *if any,* to adjacent tide and overflow lands." (Italics added.)

The reformed contract also required Moyer to pay the full purchase price which he had bargained to pay for "insured title" to the property and rights described in the contract before it was reformed.

The trial court was faced with these alternatives:

(1) To deny the equitable defense of reformation would expose the Ramseyers to those damages, if any, to which Moyer might convince a jury he was entitled. And Moyer's part in the transaction was not blameless.

(2) To allow reformation could enrich the Ramseyers at the expense of Moyer.

Rescission and restitution were not sought in the pleadings. Some timber had been removed from the land. Improvements which may have been of considerable value to Moyer but were not necessarily of equal value to the Ramseyers had been placed on the land. The costs of roads and mill ponds, for example, may have exceeded the value of the land. Neither party conveniently could be returned to the *status quo ante* the contract of November 19, 1954.

■ Reformation ordinarily requires:

(1) An antecedent agreement to which a writing can be reformed. *Manning Lumber Co. v. Voget,* 188 Or 486, 497, 216 P2d 674; *G. E. Supply Corp. v. Republic Cons. Corp.,* 201 Or 690, 272 P2d 201;

(2) Equities justifying the relief. *Manning Lumber Co. v. Voget,* supra.

There was no different antecedent agreement to which the contract could be reformed. Moyer had not offered to purchase only that land conforming to the legal description found in the Davis lease. He had instructed his scrivener to add the description of specific river rights which the Ramseyers could undertake to convey or not, as they saw fit before they signed a contract to sell.

The trial court "reformed" the agreement to require Ramseyers to convey whatever interest they had, despite proof that such interest was not what Moyer had contracted to buy.

■ It may be true that the Ramseyers owned limited riparian rights which could be useful to the upland owner, but this question was not before the lower court. To rewrite the contract so as to convey dubious riparian rights was to make a new bargain. *Wikstrom*

*v. Davis et ux,* 211 Or 254, 268, 315 P2d 597. The question before the court was whether the contract of November 19, 1954, should be rewritten for the parties to accomplish a true intent mistakenly expressed. The reformation which the court decreed adopted the questionable intent of the sellers contrary to the expressed intent of the purchaser. It may well have been true that there was no subjective meeting of the minds. But the contract as written was cogent evidence to the contrary. An improvident agreement is no less binding than a prudent one if otherwise free from defect.

 Reformation (to conform to an actual or intended antecedent agreement) may be had for mutual mistake, or for an excusable mistake by one party coupled with fraud on the part of the other party. It is also the rule that to obtain reformation the evidence of equities which justify such extraordinary relief as well as evidence to prove the agreement really intended must be clear and unequivocal. See *Williams v. Swartz,* 222 Or 223, 350 P2d 1079; Restatement, 2 Contracts 981, § 511.

 The evidence in the record does not meet the test either with reference to an antecedent contract or with reference to equities justifying relief. The decree of the trial court must be reversed, with directions to reinstate the contract, reformed as to the admittedly erroneous description of the southeast one quarter of Section 16, and to proceed with the action at law.

Reversed with directions; costs to neither party.