Argued May 7, affirmed June 19, petition for rehearing
denied August 2, 1963

## RAY ET UX *v.* RICKETTS
and
## RAY ET UX *v.* WILSON ET UX

383 P. 2d 52

*Thomas H. Tongue,* Portland, argued the cause for appellants. With him on the briefs were Roy Kilpatrick, Canyon City, and Charles S. Crookham, Portland.

*Gene B. Conklin,* Pendleton, argued the cause for respondent Ricketts. With him on the brief were Yokom & Campbell, John Day.

*R. Thomas Gooding* and *S. H. Burleigh,* La Grande, argued the cause for respondents Wilson. On the brief were Burleigh, Carey & Gooding, La Grande.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and DENECKE, Justices.

GOODWIN, J.

Plaintiff, the transferee of certain demand notes, brought action against the defendants upon their indorsements. The trial court granted the defendants the equitable relief of reformation, and ordered the indorsements to be reformed so as to read "without recourse". Upon such reformation, the action evaporated. Plaintiff appeals.

■ The controlling question is whether the trial court correctly evaluated the evidence. Acting under the requirement of ORS 17.440 that this court try suits *de novo,* we treat the proceedings below as a suit. The only questions decided were those presented by the equitable defense and prayer for reformation.

The undisputed facts may be outlined briefly as follows: In 1956, the defendants were the owners of the controlling stock in a corporation known as Western Timber Products Company. Western Timber operated a sawmill in New Mexico. The corporation was handicapped by a shortage of working capital, and was in need of cash in order to meet its payroll and to keep from losing its timber supply. The corporation had valuable assets in a timber contract and a relatively new sawmill plant. The corporation also had liabilities, including the unpaid balances owed on the timber and on the sawmill equipment. As a going concern, the sawmill with the timber was worth substantially more than the total of the liabilities. In the event of nonperformance of its timber contract, however, the sawmill would have lost its timber. Without timber, the mill would have had salvage value only.

All the parties, so far as may be material here, were experienced lumbermen. The plaintiff sought out the defendants. The plaintiff had money to invest. The defendants had reached the point beyond which they were reluctant to make further advances of capital to the corporation. The defendants denied that they were desperate for money, but admitted that new money looked good to them. Both defendants had loaned money to the corporation on an unsecured account. The total investment of the defendant Wilson amounted to $181,000. The total investment of the defendant Ricketts amounted to $141,000. Their re-

spective advances to the corporation equalled roughly half their total investment. Their original investments were represented by stock. Wilson had loaned the corporation about $93,000 and Ricketts had loaned it about $87,000. Round numbers are sufficient for the purposes of this case. In addition to cash advanced to the corporation, Wilson and Ricketts had co-signed as personal guarantors certain time-payment contracts for sawmill machinery. The contracts then had unpaid balances of some $300,000, or about half their original obligations.

The plaintiff agreed to buy the defendants out for $160,000 cash. The parties agreed that in consideration of the sale of the defendants' stock in the corporation for $160,000 the plaintiff would save the defendants harmless of any contingent liability under the above-mentioned contracts. Subsequently the contracts were paid. The save-harmless agreement thus is relevant solely for the light it sheds upon the intent of the parties.

The principal dispute concerns the intention of the parties with reference to the cash advances to the corporation by the defendants. The defendants contend that they did not care whether the accounts owed them by Western Timber were represented by stock or by notes. They wanted out. They were to receive $160,000 for their interest in the corporation, as is, with the plaintiff to take over their claims against the corporation as well as their equities in it. They swore that their purpose in selling for less than half of what they had in the corporation was to get out before they had to put in any more money. They admitted that they were particularly interested in being relieved of their contingent liability on the conditional-sale contracts. They were to relinquish control of the corporation.

The lumber market was not good. They did not want to be subject to liabilities that might be enhanced by operations in which they had no voice. The defendants contend that the accounts payable from Western Timber to themselves were assigned to the plaintiff in the manner the plaintiff designated, solely for the convenience of the plaintiff. The transfer of the accounts was made as follows: The amounts advanced to the corporation were (or previously had been) reduced to promissory notes, prepared on printed forms, each note payable to one of the defendants. Each respective payee of a note then indorsed it "Pay to Huber Ray or Frieda Ray  *  *  *  [payee's signature]." The record is unclear whether these notes had been executed by Western Timber contemporaneously with the advances, or were executed contemporaneously with the sale to the plaintiff. In either event, no party in the proceedings at bar questioned the execution or delivery of the notes. The sole question concerns the indorsements.

It is the theory of the plaintiff that since the notes were indorsed without qualification, and since the notes were not paid by Western Timber upon demand, the indorsers became liable under general law relating to commercial paper. See ORS 71.066.

It is the theory of the indorsers that they had merely assigned their debts to the plaintiff in the manner designated by the plaintiff, and that none of the parties intended to have the defendants become personally liable on their indorsements. See ORS 71.038 (qualified indorsement). The defendants clearly would not have been liable if the corporation had issued additional stock, instead of notes, to cover the advances.

The plaintiff resisted reformation of the indorse-

ments on the ground that there was no antecedent contract to which reformation could be directed. The plaintiff swore that he knew all the time that the indorsers would be liable, and that he wanted it that way because he wanted the possibility of recoupment in case the investment he was about to make did not turn out well. The plaintiff relies heavily upon his assumption of, and payment of the $300,000 balance owed on the sawmill. The plaintiff says his assumption of the contract balance was consideration for the liability of the indorsers.

The lawyer who had represented the plaintiff at the time the notes were transferred and in whose office at least part of the notes were indorsed, however, testified that he recalled the transaction as an assignment, or its equivalent. The lawyer did not recall any discussion of liability on the indorsements.

The plaintiff admitted on cross-examination that the tax advantages of taking notes instead of additional stock from the corporation may have appealed to him at the time. At one point he said the notes might have been attractive to him. At another point he said they made no difference. Whichever statement most accurately reflects his intent at the time of the transaction, neither tends to prove that he had any right to treat the indorsements as more than assignments.

The record also reveals that the demand notes in this case were held until shortly before the statute of limitations had run, even though the plaintiff was in need of money much earlier. He said he lost over a half-million dollars in Western Timber before the company went into liquidation, but it apparently did not occur to him to seek recovery on the notes until he was advised by others to do so.

■ We are satisfied that the antecedent agreement of the parties was to assign the corporate debts to the plaintiff to use in the manner most favorable to him, and to take the defendants completely out of the corporation. Reformation to make the indorsements read "without recourse" was consistent with the bargain the parties made.

This is not a case in which this court, on a paper record, should overturn the findings of fact made by an experienced trial judge who spent several days in the courtroom with the parties, observing and listening as they gave their conflicting recollections of their intent some six years before. See *Blue River Sawmills et al v. Gates,* 225 Or 439, 473, 358 P2d 239 (1961).

■ The plaintiff contends now that even if the trial court was right on the facts, which he denies, it was error to grant reformation. The plaintiff relies on the settled rule that there must be an antecedent contract to which effect can be given by the reformation. The rule is a good rule. Affirming the decree in the case at bar, moreover, will do no violence to it. There was adequate proof that the parties intended the transaction to be the one found by the trial judge and not the one the plaintiff now says he secretly intended. It struck the trial court as unusual that the defendants would enter into a bargain to pay the plaintiff upon demand for taking a valuable business off their hands. In the event that the corporation, later, under the plaintiff's exclusive control, could not pay or preferred not to pay the notes, the original owners, under the plaintiff's theory, agreed to do so. The trial judge concluded that the true agreement of the parties was otherwise.

■ However, even if the plaintiff is right concerning his own intent, i.e., that he entertained an undis-

closed intent to employ the unqualified indorsements as some kind of insurance against a hazardous investment, his undisclosed purposes cannot avail him in this case. It is clear that the indorsers, acting under the direction of the plaintiff's attorney, thought they were simply assigning the debts to the plaintiff. This kind of unilateral mistake does not prohibit reformation.

Taken in the light most favorable to the plaintiff, the facts in the case at bar would clearly fall within the rule found in Restatement, 2 Contracts 973, § 505:

> "Except as stated in §§ 506, 509-511, if one party at the time of the execution of a written instrument knows not only that the writing does not accurately express the intention of the other party as to the terms to be embodied therein, but knows what that intention is, the latter can have the writing reformed so that it will express that intention."

See, also, 3 Corbin, Contracts 730, § 614 (1960 ed); 5 Williston, Contracts 4340, § 1548 (rev ed 1937).

■ The evidence in support of reformation must be clear and convincing. *Weatherford v. Weatherford et al,* 199 Or 290, 257 P2d 263, 260 P2d 1097 (1953); Restatement, 2 Contracts 981, § 511. In this case the evidence fully satisfied the requirement that the defendants prove their case with a high degree of probability.

Affirmed; costs to neither party.