UNITED PACIFIC INSURANCE COM-
PANY, a corporation, Plaintiff,

v.

TIMBER ACCESS INDUSTRIES CO., a
corporation, and Harold F. Ramsey and
Frances H. Ramsey, husband and wife,
Defendants.

Civ. No. 67–335.

United States District Court
D. Oregon.

Aug. 10, 1967.

Paul R. Meyer, Kobin & Meyer, Port-
land, Or., for plaintiff.

James R. Moore, Mautz, Souther,
Spaulding, Kinsey & Williamson, Port-
land, Or., for defendants.

## OPINION

KILKENNY, District Judge:

Plaintiff seeks a mandatory injunction directing the defendants: (1) to specifically perform their obligations under an indemnity agreement, (2) to refrain from interfering with plaintiff's exercise of its rights under the general indemnity agreement, (3) to indemnify and keep indemnified and hold plaintiff harmless against all loss, cost, expenses and attorney fees, and all other liabilities arising out of the plaintiff's execution of certain bonds given by Timber Access, as principal, and plaintiff, as surety, to the United States of America, and as an incident, (4) awarding plaintiff judgment against defendants, and each of them, for such sum as may be or hereafter be ascertained or required to indemnify the plaintiff, (5) awarding judgment against defendants for costs and disbursements including a reasonable attorney fee, and (6) such other and further relief as to the Court may seem just and equitable.

Although the original hearing was for the purpose of determining whether a preliminary injunction should be issued, the parties now agree that all of the evidence is before the Court and that the Court, insofar as now indicated, should enter a final decree, either granting relief or dismissing the case.

Defendants Ramsey are the sole owners of the capital stock of defendant corporation.

Involved, with other property, are approximately thirty timber contracts and bonds, fifteen with the Bureau of Land Management (BLM), one with the Department of Indian Affairs and the balance with the United States Forest Service. Each contract has in it a non-assignment clause.[1] Two of the bonds were blanket payment bonds, the remainder being performance bonds covering various timber purchase contracts entered into between defendant, Timber Access, and the governmental agencies. It is the claim of the plaintiff that defendants, and each of them, executed and delivered to plaintiff a general indemnity agreement wherein, among other things, defendants agreed to indemnify and keep indemnified and hold plaintiff safe and harmless from all loss, cost, damages, expense and attorney fees and any and all liability which the plaintiff might incur by reason of the execution of the bonds. The indemnity agreement provided that in the event plaintiff was required, or deemed it necessary, to reserve from its assets any amount to cover any claim or claims, contingent or otherwise, under said bonds by reason of a default of Timber Access that the defendants would, upon demand, deposit with plaintiff, in current funds, an amount sufficient to cover such reserve or other securities thereof to secure the full indemnification of plaintiff under the agreement.

Plaintiff further charges that it is now exposed to claims and demands on the part of the United States under said bonds for approximately $264,000.00, all as a result of defaults on the part of Timber Access. That demand has been made on defendants to place with plaintiff sufficient funds, or other collateral security, to cover such claims and sufficient to secure plaintiff against the claims and losses to which it is now exposed. Defendants have refused and neglected to comply with said demands. It is also charged that the defendants have further breached the indemnity agreement by failure to pay the premiums on the aforesaid bonds as they became due and payable and by refusing to acknowledge plaintiff's rights under the indemnity agreement to take steps to secure plaintiff with respect to an assignment to plaintiff of the rights of Timber Access of its contract rights and of the machinery, equipment, plant, tools and machinery utilized by Timber Access in connection with work under the contract secured by the bond.

---

1.  41 U.S.C. § 15, 31 U.S.C. § 203.

Defendants contend: (1) that although they signed the general indemnity agreement, that plaintiff represented to them that the agreement was desired solely to secure plaintiff in connection with bonds issued by plaintiff on contracts with the Bureau of Public Roads and that plaintiff did not desire, or require, an indemnity agreement as security for bonds issued in connection with timber sale contracts, and that due to the fraudulent misrepresentations and a mutual mistake, the indemnity agreement should be reformed to express the true intent of the parties, (2) that the contracts contain an express clause prohibiting assignment, all in conformity to 41 U.S.C. § 15 and 31 U.S.C. § 203, and that any action by this Court attempting to require defendants to assign these contracts to plaintiff would be null and void, (3) that the provisions of the contract and plaintiff's rights do not include contracts on which no default or breach exists, and (4) since plaintiff has paid nothing on the demands of creditors, it is not in a position to assert its rights under the indemnity agreement.

■ This being a diversity case, I am governed by Oregon law. Consequently, as a guide, I must follow the Oregon rule that a Court may decree reformation of a written contract only if the evidence of the mistake or fraud is "full, clear, cogent and decisive." Menefee Lumber Co. v. Gamble, 119 Or. 224, 234, 242 P. 628 (1926); Moyer v. Ramseyer, 226 Or. 122, 359 P.2d 407 (1961); Ray v. Ricketts, 235 Or. 243, 383 P.2d 52 (1963); Lundgren v. Freeman, 307 F.2d 104, 113 (9th Cir. 1962). It has even been said that a mere preponderance of the evidence is not sufficient. Kontz v. B. P. John Furniture Corp., 167 Or. 187, 205, 115 P.2d 319, 326 (1941).

■■ Here, the evidence preponderates in favor of the plaintiff, rather than defendants. I am convinced that defendants, including the individual defendants, were well aware of the distinction between an indemnity agreement, the coverage of which would be limited to a specific contract or job, and a general indemnity agreement, such as signed by defendants, which would cover not only the bond then under consideration, but such future bonds as might be executed, on the same general subject, by the parties. No satisfactory reason has been given by defendants as to why Mr. Bird, a joint venturer with Mr. Ramsey, signed the former type of indemnity agreement, while the Ramseys signed a general agreement in connection with the transaction in question. A complete analysis of the entire record leads to an inevitable finding that the general indemnity agreement, which is dated June 19, 1961, and acknowledged July 19, 1962, executed by both Timber Access and the Ramseys was, in fact, intended as a general indemnity agreement to cover all future transactions between the parties. Otherwise, the Court would be led to the finding that plaintiff underwrote millions of dollars worth of bonds for defendants with no indemnity agreement whatsoever. Good common sense prevents such a finding. For that matter, Oregon law invokes a disputable presumption that "the ordinary course of business has been followed."[2]

As to the activities of the parties in 1961 and 1962, with reference to this issue, I was greatly impressed with the testimony of the witness Thompson. His testimony dovetails with the written evidence far better than that of the witness Bird and the defendant Ramsey. I am convinced that they are confusing the situation as it existed in August, 1961, with that which existed in August, 1962. Thompson's memorandum of September 14, 1961, when examined in the light of the other evidence is almost conclusive that plaintiff had a promise of general indemnity from Timber Access and Ramsey in September of 1961. General indemnity forms were forwarded to the defendants at that time, but not returned. It would seem that this was not a new procedure with defendants Ramsey. One

2. ORS 41.360(20).

of the exhibits discloses that another insurance company refused to bond Ramsey's contract "because of past experience with Ramsey, i.e., he promised indemnity but after bond was written, didn't come through." On the record before me, as finally analyzed, I have no difficulty in finding that in June, 1962, Mr. Thompson directed his secretary to send a new general form to the Ramseys for execution and that he told Ramsey that the company would issue no further bonds until it received this executed form. This form was executed by defendants and is the indemnity agreement here at issue.

Bird's testimony, although quite positive, is considerably weakened by the fact that he had little, if any, recollection of events of a similar character. For example, he had no recollection of ever signing another application to the plaintiff. The record is clear that he signed four specific applications for bonds to assist the defendants, the first being in August, 1961, the second in August, 1962, the third in December, 1962, and the last in January, 1963. In the final analysis, the only real dispute between the parties is as to whether the conversation in the Benton Hotel was held in 1961 or 1962. The record convinces me that this took place in 1961. Otherwise, Thompson's memorandum is meaningless and his testimony must be discarded. That defendants fully understood they were signing a general indemnity agreement is supported by the testimony of the witnesses Kemp, Schoffstal, Miller and Johnson, in addition to the witness Thompson.

In direct contradiction of Ramseys' contentions are their own acts after the execution of the agreement. Time, and time again, the Ramseys furnished financial statements to United Pacific. Clearly, there would be no occasion for defendants Ramsey to furnish a financial statement unless such statements were to be used for the purpose of underwriting the various bonds here in question.

These actions of the defendants and the actions of the plaintiff in going forward with the execution of the bonds demonstrate, almost beyond question, that the parties intended the indemnity agreement of June 19, 1961, to be general in nature and not restricted to a particular transaction. The underwriting abstract of the company dated October 11, 1962, reflects the company's intention in connection with an execution of the bond following the Big River—Elk Meadows timber cutting contract of August, 1962. To quote from the abstract, with reference to the indemnitors, "Corporation, plus Harold F. and Frances Ramsey, GIA dated 6/19/61." Add to this the testimony of Johnson, Schoffstal and Thompson, and what, to me, at one time appeared to be hazy, is now placed in proper focus. The passage of years and the tragedy of the moment have dimmed the recollection of Mr. Ramsey and Mr. Bird. Their testimony just doesn't fit with the other facts in the case. Further Defendants have failed to carry their burden by a preponderance of the evidence, let alone "cogent, clear and convincing testimony." The indemnity agreement of June 19, 1961, was duly made, executed and delivered by defendants.

The evidence established, with certainty, that the defendant Timber Access was, at the commencement of this litigation, insolvent and unable to pay its obligations in the usual and ordinary course of business.

## NON-ASSIGNMENT CLAUSE

In general, non-assignment provisions have been held to apply to assignments of a contractor to his surety. General Cas. Co. of America v. Second National Bank of Houston, 178 F.2d 679 (5th Cir. 1949); Coconut Grove Exchange Bank v. New Amsterdam Cas. Co., 149 F.2d 73 (5th Cir. 1945). The legislation[3] was enacted for the benefit of the United States and if the United States recognizes the assignment, the parties

3. 41 U.S.C. § 15, 31 U.S.C. § 203.

are not in a position to object. United Pacific Ins. Co. v. United States, 358 F.2d 966, 970, 175 Ct.Cl. 118 (1966). Here, the United States, on the record before me, has not taken a definite position, although it called the parties attention to Section 203, supra.

■ National Bank of Commerce of Seattle v. Downie, 218 U.S. 345, 31 S.Ct. 89, 54 L.Ed. 1065 (1910), once the leading case on the subject, holding that the statutory requirements not only made the transfers null and void as to the Government, but also as to the transferee, has been eroded by Martin v. National Surety Co., 300 U.S. 588, 596, 57 S.Ct. 531, 81 L.Ed. 822 (1937) and Danning v. Mintz, 367 F.2d 304, 305 (9th Cir. 1966), to such an extent that it no longer is considered the law. Matter of Ideal Mercantile Corp., 244 F.2d 828 (2d Cir. 1957), cert. denied 355 U.S. 856, 78 S.Ct. 84, 2 L.Ed. 2d 63 (1957) would, at first glance give new life to *Downie*. But the decision in Ideal Mercantile turns on the construction of 11 U.S.C. § 96a (2), rather than on the sections of the United States Code prohibiting an assignment of a Government contract, and is not controlling. In any event, I am inclined to follow *Mintz* and hold that a valid assignment may be enforceable between the parties even though it might be challenged by the United States.

■ This conclusion, however, does not mean that I will here order the defendants to transfer and assign the Government contracts in question. The United States, although not a party to these proceedings, is vitally interested in the outcome. Having decided that the indemnity agreement on which the plaintiff relies is enforceable, I shall now give the plaintiff two weeks from this date in which to obtain the consent of the United States to what would otherwise be an involuntary assignment by order of this Court. I shall then decide what further action to take.

The other defenses raised by the defendants are without merit.