32 October 8, 2015 No. 39

IN THE SUPREME COURT OF THE
STATE OF OREGON

A&T SIDING, INC.,
*Plaintiff,*

*v.*

CAPITOL SPECIALTY
INSURANCE CORPORATION,
*Defendant.*

(US District Court No. 12-35180; SC S062330)

En Banc

On certified question from the United States Court of Appeals for the Ninth Circuit; certification order dated May 27, 2014; certification accepted October 2, 2014; argued and submitted April 1, 2015.

Gregory W. Byrne, Buckley Law PC, Lake Oswego, argued the cause and filed the brief for plaintiff.

Brian C. Hickman, Gordon & Polscer, LLC, Portland, argued the cause and filed the brief for defendant.

LANDAU, J.

Certified question answered.

**LANDAU, J.**

This case is before us on a certified question of Oregon law from the United States Court of Appeals for the Ninth Circuit. *A&T Siding, Inc. v. Capitol Specialty Ins. Corp.*, 356 Or 399, 337 P3d 128 (2014) (accepting certified question); ORS 28.200 to 28.255 (granting Oregon Supreme Court authority to answer certified questions and describing procedure). The question arises out of a construction contract dispute in which a homeowner's association sued a builder in state court for construction defects. The homeowner's association and the builder settled, and the settlement included an unconditional release and covenant not to execute against the builder. When the homeowner's association attempted to garnish the builder's liability insurance policy, however, the insurer claimed that it had no liability because the settlement unconditionally released its insured from any liability. The state trial court agreed, and the builder appealed.

Meanwhile, in response to the state trial court's conclusion that the settlement agreement eliminated the insurer's liability, the homeowner's association and the builder amended their settlement agreement to eliminate the unconditional release and covenant not to execute. Then, pursuant to the new agreement, the builder initiated this action—which we refer to as "the federal court action" because it eventually was removed to federal court—against its insurer. In the federal court action, the insurer argued that the state court already had determined that, given the terms of the original settlement, the builder could not recover under its insurance policy and that the parties lacked authority to create any new insurance coverage obligation by amending their settlement agreement. The federal district court agreed. On appeal, the Ninth Circuit certified a question to us asking whether the homeowner's association and the builder could amend their settlement agreement in such a way as to revive the liability of the builder's insurer.

We accepted the certified question, but, to ensure consistent application of the law in the pending state and federal appeals, we asked the parties to address additional issues concerning the legal basis for the amended settlement

agreement and the legal effect of the amended settlement agreement. We limit the scope of this opinion, however, to the Ninth Circuit's certified question. In brief, we conclude that, although the parties possessed authority to amend the terms of their settlement agreement, they could not do so in a way that retroactively revived the liability that was eliminated in their original agreement—at least not on the basis of the legal theories that they have proposed.

## I.  BACKGROUND

The Brownstone Homes Condominium Association discovered defects in the construction of its 26-building condominium complex, including wood decay, flashing delamination, and water penetration. In consequence, Brownstone initiated a negligence action against the general contractor who built the complex, as well as one of its subcontractors, A&T Siding. Brownstone estimated that A&T's share of the cost of repair was approximately $2 million. A&T was insured by Capitol Specialty Insurance Corporation and Zurich Insurance.

Initially, both Capitol and Zurich undertook to defend A&T in the action, but Capitol later withdrew its defense on the ground that the damage for which Brownstone sought recovery from A&T was not within the terms of A&T's coverage. Brownstone eventually settled with A&T and Zurich. The settlement agreement included the following provisions that are relevant to the certified questions before us. First, A&T agreed to a $2 million stipulated judgment against it and in favor of Brownstone, $900,000 of which would be deemed satisfied by Zurich's payment to Brownstone of that amount on A&T's behalf. Second, Brownstone covenanted that "in no event will it execute upon or permit the execution of the stipulated judgment against A&T or its assets." Instead, the parties agreed that Brownstone would be entitled "to seek recovery of the unexecuted portion of the judgment against Capitol." Third, A&T assigned to Brownstone any claims arising out of the matter that A&T might have against Capitol. Fourth, A&T promised that it would "reasonably and in good faith cooperate with [Brownstone]" in pursuing any assigned claims. Fifth, the parties mutually agreed to release each other from "all past, present and

future claims" arising out of the dispute. Finally, the parties declared that they did *not* intend to release any claims against Capitol as A&T's insurance carrier.

Brownstone then served a writ of garnishment on Capitol under ORS 18.352[1] for the unpaid portion of the stipulated judgment—$1.1 million. Capitol rejected the garnishment. Brownstone then applied to the Multnomah County Circuit Court for an order requiring Capitol to appear for a hearing on whether it was be liable for the $1.1 million. *See* ORS 18.778; ORS 18.782 (process for obtaining order to appear for hearing to determine whether garnishee should be held liable). Capitol appeared and moved for summary judgment, arguing that, because the settlement agreement between Brownstone and A&T released A&T from any liability that might otherwise have been covered by the policy, under *Stubblefield v. St. Paul Fire & Marine*, 267 Or 397, 517 P2d 262 (1973), Capitol—whose liability is entirely derivative of its insured's—was likewise released from any liability.

In *Stubblefield*, the plaintiff and the defendant in a tort action entered into a settlement agreement that was much like the one Brownstone and A&T executed in this case: It included a stipulated money judgment against the defendant, an assignment of the defendant's rights against his insurance company to the plaintiff, and the plaintiff's covenant not to execute against the defendant, but instead to seek satisfaction of the judgment solely from the defendant's liability insurer. After the plaintiff initiated a breach of contract action against the insurer under the assignment, this court held that the plaintiff had acquired no enforceable claims or rights against the insurance company under the assignment. This court reasoned that the defendant's insurance policy limited an insured's coverage to sums that the insured was "legally obligated" to pay as damages, and, under the covenant not to execute that the plaintiff had

---

[1] ORS 18.352 provides:

"Whenever a judgment debtor has a policy of insurance covering liability, or indemnity for any injury or damage to person or property, which injury or damage constituted the cause of action in which the judgment was rendered, the amount covered by the policy of insurance shall be subject to attachment upon the execution issued upon the judgment."

given in exchange for the defendant's assignment of his claims, the defendant had been excused from any legal obligation to pay the judgment. 267 Or at 400-01.

In response to Capitol's summary judgment motion, A&T argued that, for various reasons, the *Stubblefield* rule did not apply. The trial court disagreed, granted Capitol's summary judgment motion, and entered judgment against Brownstone.

After judgment had been entered, Brownstone and A&T executed an "addendum" to their settlement agreement, which they believed would avoid the application of *Stubblefield.* The addendum began by reciting that the intent of the parties in entering into the original settlement agreement had been "to provide [Brownstone] with the right and capability to collect the $1.1 million unsatisfied balance of the stipulated judgment from Capitol," that the trial court's decision in the garnishment action had been contrary to that intent, and that the addendum had been executed "to further and more clearly express" the intent of the parties in entering into the settlement agreement. The addendum thereafter eliminated the original assignment of A&T's claims against Capitol and replaced it with a requirement that A&T itself pursue any claims it might have against Capitol under Brownstone's direction and at Brownstone's expense. The addendum also replaced the original unconditional covenant not to execute against A&T with a narrower promise not to execute against A&T while A&T's action against Capitol was pending.[2] The addendum further declared that Brownstone would provide a full satisfaction of the judgment against A&T upon payment of any proceeds obtained in the action against Capitol to Brownstone. Finally, the addendum replaced the original

_____

[2] In *Lancaster v. Royal Ins. Co. of America*, 302 Or 62, 66-67, 726 P2d 371 (1986), this court held that the *Stubblefield* rule applies only when the settlement agreement "unambiguously" and "unconditionally" eliminates any liability for which insurance coverage might otherwise be triggered. More recently, in *Terrain Tamers v. Insurance Marketing Corp.*, 210 Or App 534, 540-41, 152 P3d 915 (2007), the Court of Appeals held that a covenant not to execute against an insured defendant during the pendency of the plaintiff's action against the defendant's insurer was not unconditional, and therefore did not implicate the rule from *Stubblefield*. The addendum to the settlement agreement in this case appears to have been designed with those holdings in mind.

unconditional release of "each and every other settling party" with a release only of Zurich.

Brownstone said nothing to the trial court or to the Court of Appeals about the execution of the addendum; rather, it pursued the appeal as if the addendum did not exist. Meanwhile, A&T initiated a separate state court action against Capitol, as required under the addendum. A&T alleged that Capitol was liable for $1.1 million of the unpaid stipulated judgment against it under either of two theories: breach of its fiduciary duty to defend A&T or breach of its contractual duties to defend and to indemnify. A&T also alleged claims for its defense costs and for punitive damages. Capitol removed the action to the United States District Court of Oregon, where it moved for summary judgment on a variety of grounds, including that A&T's claims were barred by the state court's decision in the garnishment action and that, in any event, the insurance policy did not cover the liability that A&T had "voluntarily assumed" in the addendum. The federal district court granted Capitol's motion and dismissed A&T's claims asserting that Capitol was obligated to pay the remaining $1.1 million of the stipulated judgment. The court rejected Capitol's contention that the state court action precluded A&T's recovery of that amount in federal court, but it agreed that Capitol's policy did not cover such liabilities, explaining:

> "The [original] agreement clearly released A&T from any liability for damage *** caused by A&T's provision and installation of defective siding. [The trial court in the garnishment proceeding] determined that, in light of the agreement and release of A&T, Capitol had no obligation to indemnify A&T or contribute to [Brownstone's] damages. Subsequently, A&T knowingly and willingly executed the addendum and agreed to assume liability for its portion of the [Brownstone's] damages and to pursue its rights under the policy on behalf of [Brownstone]. The execution of the addendum created a new contractual obligation running from A&T to [Brownstone]. The intentional assumption of a liability created through a contract does not result in physical injury or loss of use o[r] property damage and is not tortious in nature. *** [Therefore,] A&T's liability to [Brownstone] created by the Addendum is not 'property damage' caused by an 'occurrence' and A&T has not met its

> burden of proving that its obligation to [Brownstone] cre-
> ated by the Addendum is [a] covered loss under the terms
> of the policy."

In other words, having determined that the original settle-
ment agreement had unconditionally released A&T from
liability to Brownstone in damages, the district court con-
cluded (as had the circuit court in the earlier state proceed-
ing) that the liability to Brownstone described in the adden-
dum could only be a new contractual liability. In the district
court's view, that contractual liability would not support any
claims against Capitol based on the insurance policy it had
issued to A&T for two reasons: (1) It does not fall within
the policy's basic term of coverage—for sums the insured is
"legally obligated to pay *as damages because of * * * property
damage*"; and (2) it falls under an express exclusion in the
policy for liabilities assumed in a contract.

      The district court also set out another reason, unre-
lated to the terms of the policy, for rejecting A&T's indemni-
fication claims based on the addendum: It would not "enforce
an agreement entered into by the parties the express intent
of which is to circumvent the finality of a valid order, and
resulting judgment, that bar[s] the claim * * * sought to be
asserted," because doing so would undermine the finality of
court actions.

      A&T appealed. Before the Ninth Circuit, A&T argued
that the addendum had not created a new contractual
obligation running from A&T to Brownstone, but instead
sought merely to give effect to the parties' original intent
that Capitol pay for the property damage A&T had caused.
It also argued that no Oregon authority precludes parties
to a settlement agreement from amending their agreement
after a court has issued a ruling based on that agreement.
Apparently unsure as to whether and how Oregon law per-
taining to the amendment of agreements would apply in
those circumstances, the Ninth Circuit certified the follow-
ing question of Oregon law to this court:

> "The parties' original settlement agreement, under which
> Brownstone Homes Condominium Association released
> A&T from liability and signed a covenant not to execute the
> stipulated judgment against A&T, was construed pursuant

to *Stubblefield* \*\*\* to also release A&T's insurer, Capitol Specialty Insurance Co. from liability. The parties to the agreement assert that such a construction is contrary to the parties' intent. Under Oregon law, may the parties amend their settlement agreement to reflect their original intent, and thereby restore the insurer's duty to provide coverage for A&T's resulting liability to the extent its policy provides coverage for the loss alleged by Brownstone?"

This court accepted the certified question. As we have noted, in light of the pendency of the state court appeal involving related issues, we reformulated the question to be briefed by the parties to address additional matters. *Allen v. Hall*, 328 Or 276, 278 n 1, 974 P2d 199 (1999) ("This court reserves the authority to reformulate certified questions."). Nevertheless, we limit the scope of this opinion to the question that the Ninth Circuit certified.

## II.   ANALYSIS

At the outset, we observe that no one contests the right of Brownstone and A&T to negotiate an amendment to the original settlement agreement. That original settlement agreement—which included an assignment of rights in exchange for, among other things, a covenant not to execute—was a contract, the effect of which is determined by application of ordinary contract principles. *Lancaster v. Royal Ins. Co. of America*, 302 Or 62, 67, 726 P2d 371 (1986) ("When an insured gives an injured party an assignment of rights in exchange for a 'covenant not to execute,' the agreements are a contract and their effect is determined by standard contract principles."). Those ordinary contract principles include the right of parties to amend their contract by mutual consent. *Bennett v. Farmers Ins. Co.*, 332 Or 138, 148, 26 P3d 785 (2001) ("It is axiomatic that parties to a contract may modify that contract by mutual assent.").

The issue that the parties do contest is the extent to which Brownstone and A&T could reform the original settlement agreement, which would have the effect of undoing the legal effect of the original agreement, as determined in the prior litigation. Capitol contends that, in the original settlement agreement, Brownstone released A&T from any liability arising out of the Brownstone litigation and further

unconditionally covenanted not to execute a judgment against A&T for such liability. In Capitol's view, the addendum that Brownstone and A&T executed could not lawfully undo that release and unconditional covenant in the absence of rescission or reformation of the original agreement, neither of which, Capitol asserts, the parties did. According to Capitol, any liability that A&T agreed to in the addendum amounts to a new contractual obligation, one that is not covered under its policy with Capitol.

A&T does not dispute that a new contractual obligation would not be covered under its policy with Capitol. It also appears to acknowledge that it could not retroactively undo the original settlement agreement except by rescission or by reformation; at least, it does not offer any alternative theories as to how that result might be achieved. It expressly concedes that neither it nor Brownstone attempted to rescind that agreement. And it further concedes that neither of those parties attempted to obtain the remedy of reformation from any court. Instead, A&T's sole argument appears to be that it and Brownstone, in effect, reformed the original settlement agreement, even if they did so without calling on the equitable authority of a court to effectuate that remedy.

As A&T sees things, the original agreement contained a "mistake of law," in that the parties "misapprehended" the legal effect of what they had agreed to. Specifically, A&T argues, the parties did not intend to execute an unconditional release and covenant not to execute that would relieve A&T—and, ultimately, Capitol—of any further liability. The negotiated reformation, A&T contends, rendered the original agreement void, so that any liability to which A&T agreed under the later, reformed agreement was not a new contractual liability, but instead related back to the underlying Brownstone litigation, which was covered by Capitol's policy.

Capitol rejoins that reformation was not available to Brownstone and A&T because the equitable doctrine requires the existence of an antecedent agreement to which the original settlement could be reformed, and in this case there is no evidence of such an antecedent agreement.

Moreover, Capitol argues, the fact that Brownstone and A&T did not foresee the legal consequences of their original agreement is not the sort of mistake that justifies reformation.

We turn, then, to the question whether Brownstone and A&T, in effect, reformed the original settlement agreement by executing the addendum. Reformation, strictly speaking, is an equitable remedy by which a court may revise the written expression of an agreement to conform to the intentions of the parties to it. *See generally* Dan B. Dobbs, 2 *Law of Remedies* § 11.6(1) (2d ed 1993). Early common-law courts hewed strictly to the form of an instrument and offered no relief for such errors in reducing the terms of an agreement to writing. *See* William H. Thomas, Jr., Comment, *Reformation of Written Instruments in Missouri*, 37 Mo L Rev 54, 54-55 (1972). English equity courts responded to the harshness of the common-law tradition by adopting a doctrine of "rectification," which authorized a court to remedy drafting errors that failed to embody the terms of the parties' intended agreement. *See* George W. Keeton, *Rectification of Instruments for Mistake in England* 14 NYU L Rev 319, 319 (1937). The English equity doctrine was adopted by courts in this country, including Oregon. *See, e.g.*, *De Tweede v. Barnett Estate*, 160 Or 406, 413-15, 85 P2d 361 (1939) (discussing rectification doctrine).

Modern reformation doctrine provides that the judicial remedy is

> "available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing. Their mistake is one as to expression—one that relates to the content or effect of the writing that is intended to express their agreement—and the appropriate remedy is reformation of that writing properly to reflect their agreement."

*Restatement (Second) of Contracts* § 155 comment a (1981); *see also Richmond v. Ogden Street Ry. Co.*, 44 Or 48, 54, 74 P 333 (1903) (where a written contract fails to express the actual agreement of the parties as contemplated, "court of equity will reform the writing so as to effectuate the intentions of the parties"). In Oregon, a court will reform a

written agreement if the party seeking that remedy establishes three things: (1) an antecedent agreement to which the contract can be reformed; (2) a mutual mistake or, alternatively, a unilateral mistake by one party along with inequitable conduct by the other party; and (3) the party seeking reformation was not grossly negligent. *Jensen v. Miller*, 280 Or 225, 228-29, 570 P2d 375 (1977). Those elements must be proved by clear and convincing evidence. *Ray v. Ricketts*, 235 Or 243, 250, 383 P2d 52 (1963). In addition, insofar as reformation is an equitable remedy, a court will not grant a reformation when the result would be inequitable to an innocent third party. *See Crahane et al v. Swan*, 212 Or 143, 149, 318 P2d 942 (1957) (equity will "not grant relief by the way of reformation to the injury of innocent third persons such as bona fide purchasers, lien holders and others who without notice have acquired intervening or vested rights and who cannot be placed in status quo").

As we have noted, reformation is a judicial remedy. As we have also noted, in this case, Brownstone and A&T did not seek that remedy. Instead, they negotiated the addendum on their own, without invoking the court's equitable power. According to A&T, even though the parties did not obtain the judicial remedy of reformation, they effected their own private reformation by executing the addendum to the original agreement. This court has not yet decided whether parties may voluntarily reform an agreement without the intervention or aid of the court. We need not decide that question in this case, however, because, at all events, the parties in this case did not satisfy the requirements for reformation.

The first such requirement is the existence of an antecedent agreement that was not adequately expressed in the parties' written contract. *Jensen¸* 280 Or at 228. Because reformation is used to revise the written contract so that it conforms to the antecedent agreement, there can be no reformation without such an antecedent agreement. *Moyer et ux v. Ramseyer et al*, 226 Or 122, 134, 359 P2d 407 (1961). In this case, A&T does not identify the nature of the antecedent agreement to which it wanted its original written settlement agreement reformed. The entirety of its argument in

its briefing as to that element of reformation consists of the assertion that "there is an antecedent agreement (App. A)." Appendix A of A&T's brief is a copy of the original written settlement agreement.

A&T apparently misapprehends the requirements of reformation. The equitable doctrine applies when the parties have reached a mutual understanding as to the material terms of a contract, but that mutual understanding is confounded by an error in the form of the written terms of that contract. In this case, A&T makes no effort to identify the terms of its agreement with Brownstone that were not given proper form in the written settlement. It simply offers the original settlement agreement and asserts that the parties wanted that agreement, as drafted, to have different legal consequences.

That leads to the second element of reformation, namely, a mistake in the drafting of the agreement such that it does not accurately express the parties' actual agreement. In *Jensen*, for example, this court upheld the reformation of a deed—specifically, the deed's description of a boundary—based on the parties' mutual mistake as to the actual location of that boundary. 280 Or at 230. Similarly, in *Webb v. Culver*, 265 Or 467, 470, 509 P2d 1173 (1973), the court affirmed a judgment reforming a land sale contract, based on the fact that the purchasers had been misled as to the location of a boundary, which had not been accurately described in the contract.

In this case, A&T argues that its original agreement contained a mutual mistake of law, in the sense that it and Brownstone did not anticipate the legal consequences of the original settlement agreement as they drafted it. As A&T explains, "Brownstone and A&T believed their original agreement was legally sufficient to seek recovery from Capitol." That belief turned out to be incorrect, at least as determined by the trial court in the state garnishment proceeding. In the words of the addendum to the settlement agreement, "the trial court's decision in favor of Capitol [was] contrary to the settling parties' intent." Again, however, A&T misunderstands the nature of the requirements of reformation.

Oregon cases recognize a distinction between different types of mistakes of law that may occur in the drafting of contracts. As this court explained in *Richmond*, 44 Or at 56:

"There are * * * two well-defined classes of mistakes common to parties entering into contracts: (1) A mistake in law as to the legal effect of the contract actually made by them; and (2) a mistake in law in reducing to writing the contract, whereby it does not carry out or effectuate the intention of the parties. In the former the contract actually entered into will seldom, if ever, be relieved against * * *. In the second class the mistake is not in the contract, but terms are used or omitted which give the instrument a legal effect not intended by the parties, and different from the contract actually made; and here equity will always grant relief, unless barred on some other ground."

The distinction between the two categories of mistake can be hard to pin down, because both may involve a mistake as to "legal effect" in some sense, as the foregoing quotation illustrates. From the case law, however, the key consideration is whether the mistake goes to the terms of the written agreement itself. If it does, then reformation is not available. *See, e.g.*, *Weatherford v. Weatherford et al*, 199 Or 290, 301, 260 P2d 1097 (1953) ("'[e]quity will not ordinarily reform the contract merely because one or both of the parties were mistaken as to its legal consequence'") (quoting *Richmond*, 44 Or at 54)); *Smith et al v. Cram et al*, 113 Or 313, 323, 230 P 812 (1925) ("[I]f the agreement is as the parties intended it should be, and the parties were simply mistaken as to the legal effect, the contract will not be reformed.").

On the other hand, a mistake of fact or a mistake of law as to the effect of an underlying agreement may result in the drafting of an agreement that does not accurately express the substance of the parties' agreement. In such cases, the written agreement may be reformed to conform to the terms that the parties actually agreed to. As the court explained in *Richmond*, if,

"'after making an agreement, in the process of reducing it to a written form, the instrument, by means of a mistake of law, fails to express the contract which the parties actually

entered into, equity will interfere, with appropriate relief, either by way of defense to its enforcement, or by cancellation, or by reformation to the same extent as if the failure of the writing to express the real contract was caused by a mistake of fact. *In this instance there is no mistake as to the legal import of the contract actually made, but the mistake of law prevents the real contract from being embodied in the written instrument*.'"

44 Or at 55 (emphasis added) (quoting John Norton Pomeroy, 2 *A Treatise on Equity Jurisprudence* § 845 (2d ed 1892)).

*Harris Pine Mills v. Davidson*, 248 Or 528, 435 P2d 310 (1968), illustrates the distinction. In that case, the parties executed a land sale contract that contained a reservation of rights to certain timber. Following the final payment on the contract, the parties executed a deed to land, but the deed failed to mention explicitly that the seller retained the timber reservation. The successor to the seller initiated an action to reform the deed, arguing that the parties had intended that the seller retain the timber reservation. This court agreed. The court began by noting that it was clear that the parties intended that the deed preserve the seller's right to the timber. 248 Or at 534. It then observed that, apparently, the parties were mistaken about the legal effect of the reservation in the underlying land sale contract. Citing *Richmond*, the court explained that such a mistake of law—not as to the deed itself, but as to the underlying land sale contract—caused a mistake in the drafting of the deed. That mistake in drafting, the court concluded, justified reformation. *Id.* at 536.[3]

Our case law drawing a distinction between mistakes in drafting that fail to express the terms of an agreement and mistakes as to legal effect is consistent with the longstanding general rule in other jurisdictions. As the Michigan Court of Appeals recently explained in *Johnson Family, Ltd., Partnership v. White Pine Wireless, LLC*., 281

---

[3] The court observed that the only other possible explanation was that the drafter of the agreement, knowing that the seller never intended to part with the timber, nevertheless drafted the deed to do just that. The court concluded that, in either event, the deed had not been drafted to express the intentions of the parties. *Harris Pine Mills*, 248 Or at 536-37.

Mich App 364, 379-80, 761 NW2d 353 (2008), "mistakes of law are divided into two classes: mistakes regarding the legal effect of the contract actually made and mistakes in reducing the instrument to writing. In the former, the contract actually entered into will seldom, if ever, be relieved against."[4]

In this case, A&T's own description of the transaction places it squarely in the category of mistakes for which the equitable remedy of reformation is not available. There is no suggestion that Brownstone and A&T negotiated an agreement that was not accurately or adequately described in the terms of the original settlement. Rather, A&T asserts only that the parties misunderstood the legal consequences of the settlement agreement to which they agreed. As we have noted, the underlying historical and equitable rationale for reformation is that parties should not be held hostage to a mistake in drafting. In this case, there was no mistake in drafting, only a mistake in predicting how a court at some time in the future would rule on the legal effect of what the parties unquestionably agreed to. Equity, at least as it is exercised under the doctrine of reformation, has no role in remedying the parties' mistaken prediction of court decisions.

_____

[4] *See also McGinley Corporation v. Lido Oil Co.*, 71 F2d 81, 82 (5th Cir 1934) ("Mistake as to what courts may hold in the future on a pending appeal furnishes no ground for setting aside or reforming a contract which at the time it was entered into correctly expressed the intention of the parties to it."); *Rector v. Collins*, 46 Ark 167, 175 (1885) ("Though the court will rectify an instrument which fails through some mistake of the draftsman in point of law to carry out the real agreement of the parties, it is not sufficient to create an equity for rectification that there has been a mistake as to the legal construction, or the legal consequences of an instrument."); *Bowles v. Miller*, 96 Colo 145, 150, 40 P2d 243 (1935) ("A mistake as to the legal effect of the contract where the language used is such as intended, is not available as a defense at law nor grounds for reformation."); *Calverly v. Harper*, 40 Ill App 96, 98 (1890) ("If any mistake was made, it was a misapprehension of the legal effect of the terms used, but for this no reformation of a contract can be had."); *Good Milking Mach. Co. v. Galloway*, 168 Iowa 550, 150 NW 710, 713 (1915) ("[E]quity will not reform a mistake of law as to the legal effect of a contract actually made."); *Ingram Day Lumber Co. v. Robertson*, 129 Miss 365, 92 So 289, 291-92 (1922) ("[T]hat the parties may have been mistaken as to its legal effect *** is no ground for equitable relief."); *Cardinal Partners, LLC, Desco Investment Co, LLC*, 301 SW3d 104, 110 (Mo. Ct. App. 2010) ("If an agreement is what the parties intended, equity will not interfere because the parties did not intend its legal effect."); *Friedman v. Platzik*, 57 NYS2d 215, 218 (1945) ("One who enters into a plain and unambiguous contract cannot avoid his obligation by showing he erred in understanding its terms.").

We conclude, then, that A&T's theory of reformation does not justify treating the addendum as relating back to the original settlement agreement. In so concluding, we express no opinion about whether other theories not argued by the parties—legal or equitable—might justify that treatment.

Certified question answered.