No. 61 September 22, 2016 341

IN THE SUPREME COURT OF THE
STATE OF OREGON

FOUNTAINCOURT HOMEOWNERS' ASSOCIATION
and FountainCourt Condominium Owners' Association,
*Plaintiffs,*

*v.*

FOUNTAINCOURT DEVELOPMENT, LLC;
et al.,
*Defendants.*

FOUNTAINCOURT DEVELOPMENT, LLC;
et al.,
*Third-Party Plaintiffs,*

*v.*

ADVANCED SURFACE INNOVATIONS, INC.,
an Oregon corporation; et al.,
*Third-Party Defendants.*

VOSS FRAMING, INC.,
assignee for FountainCourt Homeowners' Association,
assignee for FountainCourt Condominium Owners' Association,
on behalf of FountainCourt Development, LLC,
on behalf of Matrix Development Corporation,
and on behalf of Legend Homes Corporation,
*Fourth-Party Plaintiff,*

*v.*

Dana CHRISTOPHER
and Red Hills Construction, Inc.,
*Fourth-Party Defendants.*

FOUNTAINCOURT HOMEOWNERS' ASSOCIATION
and FountainCourt Condominium Owners' Association,
*Respondents on Review,*

*v.*

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY,
*Petitioner on Review.*

(CC C075333CV, CA A147420; SC S062691)

On appeal from the Court of Appeals.*

Argued and submitted September 10, 2015.

L. Kathleen Chaney, Lambdin & Chaney LLP, Denver, Colorado, argued the cause and filed the briefs for petitioner on review.

Anthony L. Rafel, Rafel Law Group PLLC, Portland, argued the cause and filed the brief for respondents on review. With him on the brief was Katie Jo Johnson, McEwan Gisvold LLP, Portland.

Michael E. Farnell, Parsons Farnell & Grien LLP, Portland, argued the cause and filed the brief for *amici curiae* Associated General Contractors - Oregon Columbia Chapter, Central Oregon Builders Association, Home Builders Association of Marion and Polk County, Home Builders Association of Metropolitan Portland, Independent Electrical Contractors of Oregon Inc, National Association of Home Builders, Northwest Utility Contractors Association, Oregon Home Builders Association, Pacific Northwest Chapter of the Associated Builders and Contractors Inc, and Professional Remodelers Organization of the HBA of Metropolitan Portland. With him on the brief was Steven R. Powers.

Bronson James, Bronson James LLC, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Thomas M. Christ, Cosgrave Vergeer Kester LLP, Portland, filed the brief for *amicus curiae* Oregon Association of Defense Counsel.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Baldwin, and Nakamoto, Justices.**

BALDWIN, J.

The decision of the Court of Appeals is affirmed. The supplemental judgment for garnishment is affirmed. The

_____

\* Appeal from Washington County Circuit Court, Marco Hernandez, Judge. 264 Or App 468, 334 P3d 973 (2014).

\*\* Linder, J., retired December 31, 2015, and did not participate in the decision of this case. Brewer, J., did not participate in the consideration or decision of this case.

supplemental judgment awarding attorney fees, costs, and disbursements is reversed as to the attorney fee award and is otherwise affirmed.

**BALDWIN, J.**

American Family Mutual Insurance Company (AFM) seeks review of a decision of the Court of Appeals that upheld a trial court judgment in a garnishment proceeding requiring AFM to pay a judgment that plaintiffs FountainCourt Homeowners' Association and FountainCourt Condominium Owners' Association (FountainCourt) had obtained against AFM's insured, Sideco, Inc. (Sideco). *FountainCourt Homeowners v. FountainCourt Develop.*, 264 Or App 468, 334 P3d 973 (2014). FountainCourt responds that the Court of Appeals correctly upheld that supplemental judgment, but argues that that court erroneously reversed a subsequent supplemental judgment that awarded attorney fees. We reject without discussion FountainCourt's arguments concerning the subsequent supplemental judgment. With respect to AFM's arguments, we conclude that the Court of Appeals correctly rejected them, and we affirm the trial court's judgment.

The underlying dispute concerns a housing development that was constructed between 2002 and 2004 in Beaverton. FountainCourt brought an action against the developers and contractors seeking damages for defects in the construction of the buildings in the development. Sideco, a subcontractor, was brought in as a third-party defendant, and a jury eventually determined that Sideco's negligence caused property damage to FountainCourt's buildings. Based on that jury verdict, the trial court entered judgment against Sideco in the amount of $485,877.84. FountainCourt then served a writ of garnishment on AFM in the amount owed by Sideco, and, in response, AFM denied that the loss was covered by its policies. FountainCourt moved for an order to show cause in the trial court why judgment should not be entered against AFM on the writ of garnishment. The trial court ultimately agreed with FountainCourt and entered judgment against AFM, after deducting the amounts that had been paid by other garnishees. AFM appealed the judgment, and the Court of Appeals affirmed.

On review, AFM raises numerous issues, some of which, as we explain below, were not properly raised in the lower courts, and others of which we reframe for purposes

of organizing our discussion. We have reframed the issues before us as follows: (1) Did the trial court properly resolve the issues raised in the garnishment proceeding in a manner that comported with this court's case law concerning an insurer's duty to defend and right to litigate coverage issues, and did not implicate AFM's right to a jury trial; and (2) did the trial court correctly interpret the insurance policies to conclude that coverage had been triggered under the policies and that AFM was liable to FountainCourt in light of FountainCourt's verdict against Sideco in the underlying negligence case? We conclude that the trial court correctly resolved those legal issues, and we affirm the trial court and the Court of Appeals.

## I.  FACTS AND PROCEDURAL POSTURE

### A.  *The Negligence Trial*

Between 2002 and 2004, FountainCourt, a planned community, was developed by defendant FountainCourt Development and built by defendant Legend Homes Corporation,[1] and much of the work on the project was carried out by subcontractors. The planned community consisted of 34 condominiums and 63 townhouses. The owners of the condominiums and townhouses (represented in this litigation by the plaintiff homeowners associations) experienced damage to their properties caused by water intrusion into the buildings. In 2007, FountainCourt initiated the underlying action against the developers and contractor, who, in turn, brought in subcontractors as third-party defendants. In an amended pleading, FountainCourt alleged direct claims of negligence against some of the subcontractors, including Sideco. In particular, FountainCourt alleged that Sideco had installed siding and windows, among other things, in such a manner as to cause water intrusion into the buildings, which resulted in physical damage to those structures.

Sideco tendered defense of the action to its insurers, including AFM. Sideco had general-liability insurance policies issued by AFM covering the period of May 1, 2004 to May 1, 2006, and a general-liability insurance policy issued

---

[1] Defendant Matrix Development Corporation is the parent company of both FountainCourt Development and Legend Homes Corporation.

by Clarendon National Insurance Company covering the period of April 15, 2003 to May 15, 2004. Clarendon and AFM accepted the tender of defense with a full reservation of rights.

At trial, FountainCourt presented evidence in support of its claims. Ultimately, the only theory of the case that went to the jury with respect to all defendants concerned property damage, and the jury was instructed as follows:

> "If you find that the plaintiffs are entitled to prevail, then you must decide whether the plaintiffs have been damaged and, if so, the amount of their damages.

> "Plaintiffs must allege and *prove physical damage to their property.* * * * The amount of damages may not exceed the sum of $3,831,635. The plaintiffs must prove damages by a preponderance of the evidence.

> "If you find the plaintiffs are entitled to damages, you should—or shall determine *the amount of physical damage to plaintiffs' real property, if any, that was caused by the defendants' fault or negligence. The measure of damages for partial destruction of real property is the reasonable cost of repairing the damaged property.*"

(Emphasis added.)

The jury returned a verdict in FountainCourt's favor and allocated percentages of fault to various defendants. While the main fault (66 percent) was found to be with the developer/primary contractor group, various subcontractors also were determined to have been negligent. The jury's verdict indicated that plaintiffs' total damages were $2,145,156, and that 22.65 percent of the damages were caused by Sideco's negligence. The trial court accordingly entered a judgment against Sideco in the amount of $485,877.84.

B.  *The Garnishment Proceeding*

FountainCourt then mailed a writ of garnishment to Sideco's insurers for the amount of its judgment against Sideco.[2] AFM filed an answer asserting that FountainCourt

---

[2] In the garnishment context, FountainCourt was, in essence, standing in the shoes of Sideco, which was insolvent at that point in time. *See generally*

had failed to state a claim. It argued that it was not obligated to pay the Sideco judgment either because some or all of the damages did not arise from "property damage" or an "occurrence," or because some or all of the property damage resulted before or after the policy periods, or because one or more exclusions applied to some or all of the losses. AFM also asserted a counterclaim for declaratory judgment concerning its liability under the policies. FountainCourt then moved for a show-cause order as to why judgment should not be entered against the insurers on the writ of garnishment, seeking a hearing pursuant to ORS 18.775.[3] AFM and Clarendon objected to resolving the issues by way of a hearing pursuant to ORS 18.775, arguing that they needed additional time to prepare, that factual issues concerning coverage that could not be resolved through such a hearing, and that they were entitled to a jury trial on those factual issues. The insurers identified as potential factual issues pertinent to coverage "the timing and cause of the alleged property damage, and the nature of the money damages awarded in the underlying action, among other things." The insurers also argued that they had raised "various coverage defenses, based upon policy endorsements and exclusions, which also will be fact-sensitive and entitle the parties to a jury trial."

The trial court held a hearing at which the parties argued their respective positions concerning how the coverage disputes should be resolved. The court indicated that it would not conduct a jury trial, as the meaning of the insurance policies presented a question of law. AMF's counsel suggested that the court should resolve some preliminary questions of law such as "who has the burden of proof" and "whether or not it's even possible at this juncture, based on the trial court record that was created, to establish when damage occurred, whether it was under one insurer's policy or another." AMF's counsel acknowledged that Sideco's

---

*State Farm Fire & Cas. v. Reuter*, 299 Or 155, 167, 700 P2d 236 (1985) (garnishor stands in the shoes of the judgment debtor).

[3] Another insurer, Maryland Casualty Company, which insured Sideco from April 2002 through April 2003 and had also been served with a writ of garnishment, settled with FountainCourt during the course of the garnishment proceeding.

liability was determined in the underlying action, but argued that additional factual issues needed to be determined:

> "One is when did damage occur. We've got three insurers. They do not have co-extensive policies. One ends. The next one begins. And each policy says it only applies to damage that occurs during the policy term. It was never an issue in the underlying case when damage occurred."

Counsel also argued that there were potential issues concerning the policy exclusions for certain multi-unit structures,[4] adding that "[w]e're going to have to assess what damages were awarded, if possible in the—by the jury for which buildings to determine the applicability of that exclusion in this particular context."

With the issues thus framed by the parties, the trial court construed the pertinent provisions of the insurance contracts. The AFM insurance policies at issue in this case provided that AFM "will pay those sums that the insured becomes legally obligated to pay as damages because of *** 'property damage' to which this insurance applies." The policies define property damages as "[p]hysical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it." The policies also provide that an "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." In addition, the policies contain the following provisions relating to "property damage":

> "b.   This insurance applies to *** 'property damage' only if:
>
> "*****
>
> "(2)   The *** 'property damage' occurs during the policy period; and

---

[4] Both the AFM policies and the Clarendon policy had exclusions for certain types of multi-unit structures, but the provisions of those policies differed significantly. The trial court ultimately concluded that Clarendon had met its burden of proof with respect to the multi-unit exclusion in its policy. That aspect of the court's decision is not at issue in this appeal.

Several other policy exclusions were raised at the garnishment hearing, but as we explain below, AFM did not raise any issues concerning the trial court's resolution of issues pertaining to exclusions in its assignments of error on appeal, and thus we do not address any issues relating to policy exclusions.

"(3)   Prior to the policy period, no insured *** knew that the *** 'property damage' had occurred, in whole or in part.

"*****

"c.   '[P]roperty damage' which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured *** includes any continuation, change or resumption of that *** 'property damage' after the end of the policy period."

At the garnishment hearing, FountainCourt maintained that the insurers had the burden of proof to show what portion of the jury's verdict in the underlying case was for damages that fell within policy exclusions and that the insurers could not meet that burden. It further argued that, in situations such as this where there are multiple insurers on this type of loss, the burden in on the insurers to work it out among themselves as to how much each insurer pays, and it is not the burden of the insured to show how that should be allocated. AFM, in contrast, argued that FountainCourt had the burden to establish that the damages that were awarded by the jury in the underlying trial were for the type of property damage covered by the policy and to show how much property damage occurred during which policy periods, but that FountainCourt could not meet its burden of proof on those issues because the jury's verdict was not segregated in a way that allowed such determinations to be made. In short, both parties argued that the other had the burden of proof as to dispositive coverage or exclusion issues, and could not meet that burden *as a matter of law*, because it was not possible to get behind the jury's verdict to determine the precise basis on which the jury had arrived at its decision concerning the extent of Sideco's liability, when property damage occurred, and the amount of property damage.

The record from the underlying trial was admitted into evidence. FountainCourt also put on expert testimony from the inspector who prepared the damage repair estimates that were admitted in the underlying trial. He testified, based on trial exhibits, about the completion dates and composition of each of the buildings, as well as

the general nature of the damage, some of which occurred when the products were installed, and some which involved water damage and that began in the fall or winter after the work was done and occurred continuously thereafter. He further testified that there was damage to underlying materials due to defects in Sideco's work during the time that the AFM policies were in effect. He opined that it was not possible to quantify how much of the consequential water damage occurred during which insurance policy period. He further testified that water damage of this type increases exponentially the longer it goes unrepaired. The witness testified that his firm's damage estimate allocated approximately $1.5 million in damages caused by Sideco's negligence. When asked if the $485,000 awarded by the jury against Sideco could all have been awarded to cover consequential water damages rather than Sideco's own work,[5] he replied that it could have. AFM presented testimony by a forensic architect who opined that the water damage to the buildings could not be precisely defined in terms of when it began or ended, and that this type of damage is cumulative.

The court concluded that FountainCourt had "met its *prima facie* burden of proving coverage under the policies," that the burden was on AFM "to prove what portions, if any, of the judgments entered against Sideco, Inc., are excluded by the policies," and that AFM had not met that burden. The court noted specifically that AFM was "unable to show whether or how the jury apportioned damages among the FountainCourt buildings; accordingly, its multiunit exclusion is inapplicable." The court entered judgment, and AFM appealed.

C.   *The Appeal*

In the Court of Appeals, AFM raised four assignments of error. It first argued that the court erred in determining that FountainCourt had met its initial burden because "FountainCourt failed to prove that any, let alone all, of the damages awarded against Sideco fell within the insuring agreement of its policy." That argument focused

---

[5] One of the policy exclusions that AFM raised concerned excusions of the policyholder's own work.

primarily on whether the damage shown by the evidence in the underlying negligence case constituted "property damage" within the meaning of the AFM policies. Second, AFM argued that, because FountainCourt's own expert at the garnishment hearing testified that it was not possible "to segregate the [jury's] verdict after-the-fact" in the garnishment proceeding, there was no evidence to support a conclusion that "the awarded damages were within Sideco's insuring agreement." Third, AFM argued that the trial court had erred in denying it a jury trial on the issue of what part of the damage to the FountainCourt buildings occurred during its policy periods. Fourth, it argued that the trial court erred in awarding FountainCourt attorney fees.

The Court of Appeals rejected all but the fourth assignment of error. *FountainCourt Homeowners*, 264 Or App at 471. The court first addressed AFM's argument that FountainCourt had failed to meet its burden of proving that the jury awarded damages for "property damage" as that term was used in its policies. The court noted that AFM's primary argument in that regard was that the jury's verdict could have included costs not only for repairing consequential water damage caused by Sideco's negligence, but also "the cost of repairing Sideco's own faulty work." *Id.* at 481. The court recognized, however, that the policy provision on which AFM relied was not, in fact, a limitation within the policy's definition of "property damage," but rather was an exclusion on which AFM had the burden of proof. *Id.* at 483-85.

The court then rejected AFM's argument that FountainCourt was required, and failed, to prove that all of the damages awarded in the underlying negligence case were for property damage that occurred during its policy periods. *Id.* at 487. It also rejected AFM's argument that the trial court's conclusion that FountainCourt had met its initial burden to show coverage under the Clarendon policy as well necessarily meant that some of the damage had occurred during the Clarendon policy period instead of the AFM policy period, stating that "the award of damages is not tied to discrete instances of property damages along a time continuum; instead the liability for property damage may be the same in every triggered policy period." *Id.* On the jury question, the court rejected AFM's argument that

a factual issue had been raised because "there was evidence presented during the garnishment proceeding that would have permitted a jury to find that consequential water damage did not occur while American Family was on the risk." *Id.* at 491. The court explained that the issue in the garnishment proceeding was one of law rather than fact: "[B]ecause the entry of the judgment triggered American Family's obligation to pay a covered debt, the court was called upon to determine the import of that judgment under the parties' contract as a *legal* matter." *Id.* (emphasis in original). Therefore, the Court of Appeals affirmed the trial court's judgment on the merits, although it reversed on the attorney fee award. *Id.* at 495. AFM sought review, which we allowed.

D.   *Limitations on Review*

Under ORAP 9.20(2), "the questions before the Supreme Court include all questions properly before the Court of Appeals that the petition or response claims were erroneously decided by that court." After we accepted review in this case, we determined that several of the issues argued by AFM on review were neither raised in its Court of Appeals briefs nor adequately developed in the trial court. In particular, AFM did not raise any issue in the Court of Appeals as to whether there were genuine issues of material fact concerning the exclusions on which it bore the burden of proof, or whether the trial court erred in concluding that AFM failed to satisfy its burden of proof regarding exclusions. Accordingly, we do not address arguments that AFM makes on review concerning policy exclusions. AFM also makes a very brief argument that it was denied both discovery and due process by the manner in which the garnishment proceeding was conducted. Because AFM failed to raise, assign error to the pertinent rulings, and adequately develop those arguments, we do not address them.

In addition, we note that, although the parties and *amici curiae* have discussed to some extent the "all sums" and "pro rata" rules of allocation of damages among multiple insurers, AFM's arguments in this case, both in the trial court and in the Court of Appeals, have never been about how, if damage occurred over multiple policy periods

involving different insurers, such damages should be apportioned. Rather, AFM maintained that FountainCourt failed to meet its burden of proof and that, as a result, AFM was not liable at all.[6] Thus, although we briefly discuss the "all sums" rule below, *see* 360 Or at 366 n 11, this case does not present the opportunity to decide whether the "all sums" or "pro rata" approach should be used in this context.

Accordingly, as previously stated, we reframe the issues before us on review as follows: (1) Did the trial court properly resolve the issues raised in the garnishment proceeding in a manner that comported with this court's case law concerning an insurer's duty to defend and right to litigate coverage issues, and did not implicate AFM's right to a jury trial; and (2) did the trial court correctly interpret the insurance policies to conclude that coverage had been triggered under the policies and that AFM was liable to FountainCourt in light of FountainCourt's verdict against Sideco in the underlying negligence case?

To answer those questions, we first examine some of the basic principles of insurance law and garnishment law, and then, we turn to the question whether the trial court properly concluded that AFM was liable under the policies at issue.

## II.   ANALYSIS

### A.   *Preliminary Issues*

We begin with several preliminary issues regarding how this insurance dispute came to be litigated in a garnishment proceeding separate from, but in conjunction with, a negligence action. We first discuss, as an initial matter, why insurance coverage issues generally are litigated separately from the liability of the insured, and then turn to issues related to garnishment proceedings.

---

[6] We further note that AFM, in its questions presented on review, referred to the present case as a "mixed coverage" case, which it described as "involving some damage that is payable by an insurer and some damage that is not." That framing of the issue implicitly assumes that an "all sums" approach is impermissible under Oregon law. *See* 360 Or at 366 n 11. Because, as explained below, AFM did not raise or litigate the applicability of the "all sums" approach below, we do not reach it.

1.  *Duty to defend and right to separately litigate coverage issues*

An insurer has a duty to defend its insured in an action against the insured if the action involves any claim stated against the insured that could impose liability for conduct covered by the policy. *Ledford v. Gutoski*, 319 Or 397, 399, 877 P2d 80 (1994). That duty remains even if the complaint also alleges conduct or damages that would not fall within the policy's coverage. *Id.* at 399-40. Thus, an insurer's duty to defend its insured in an action is not necessarily co-extensive with its duty to indemnify its insured when the insured does not prevail in that action. For that reason, insurers defend under a reservation of rights, in order to separately litigate coverage issues, as explained below. That is, situations may arise in which the insured's liability in the underlying action, despite being potentially covered under the policy in light of the pleadings, may not ultimately be covered by the policy. The insurer's and the insured's interests may align perfectly in the underlying proceeding in which the insurer has a duty to defend, in that both share the interest in establishing that the insured is not liable to the plaintiff. Beyond that point, however, the interests may diverge, particularly in cases in which the insured's liability may be based on conduct that is not covered, on occurrences outside of the scope of the policy, or on specifics embodied in policy exclusions, among other reasons. Of course, the insured would prefer that, if found liable, the damages be covered by insurance, whereas the insurer would prefer that if its insured is found liable, the liability is for something that is not within the policy's coverage. Thus, the potential for a conflict of interest often is present in situations in which an insurer is obligated to defend its insured.

When an insured is represented by attorneys provided by the insurer, the insured relinquishes control over the defense of the claim, and a fiduciary relationship is created between the insured and insurer that exists independent of the insurance contract. *Georgetown Realty v. The Home Ins. Co.*, 313 Or 97, 111, 831 P2d 7 (1992). In this situation, insurers are required "to exercise due diligence in the defense of claims against insureds." *Maine*

*Bonding v. Centennial Ins. Co.*, 298 Or 514, 518, 693 P2d 1296 (1985). As a practical matter, this means that an insurer that defends its insured in an underlying action in a way that is detrimental to the insured in order to favor the insurer may become liable to the insured in tort. *See, e.g.*, [*Goddard v. Farmers Ins. Co.*](), 344 Or 232, 179 P3d 645 (2008) (upholding punitive damage award against insurer based on insurer's bad faith in litigating underlying action against insured).

The tension created by situations where the insureds' and insurers' interests are not perfectly aligned has been the subject of much litigation over the years, culminating in the rule of law announced in *Ferguson v. Birmingham Fire Ins.*, 254 Or 496, 460 P2d 342 (1969). In *Ferguson*, the insured was sued for timber trespass and tendered defense to the insurer. The insurer offered to defend under a reservation of rights, but the insured declined. At trial in the underlying action, the jury found that the trespass had occurred, but that it was not intentional. The insured then brought an action against the insurer seeking to recover the damages as well as the costs of defending the underlying action. *Id.* at 500-01. The insurer maintained that it had no duty to defend because a policy exclusion applied. This court explained that the insurer did have a duty to defend under these circumstances, and discussed the potential difficulties faced by an insurer in such a situation:

> "If the insurer assumes the defense in the face of the insured's refusal to accede to insurer's request for a reservation of rights, it is said that the insurer 'waives' or is 'estopped' to assert the defense of noncoverage. And if the insurer, in order to avoid the loss of its right to question coverage, rejects the tender of the defense, it loses the benefits that accrue from being represented by its own counsel who ordinarily is experienced in the defense of such actions. And if it guesses wrong on the question of coverage, it will be required to pay the judgment and the costs of defense. Thus the insurer is forced to choose between two alternatives either of which exposes it to a possible detriment or loss.

> "What is the justification for imposing this dilemma upon the insurer? *Where there is a conflict of interest between the insurer and insured and the judgment in the*

*action against the insured can be relied upon as an estoppel by judgment in a subsequent action on the issue of coverage, the control of the action by the insurer could adversely affect the insured if the judgment was based upon conduct of the insured not falling within the coverage of the policy. Likewise, the insurer could be adversely affected by a judgment based upon conduct for which there is coverage.* But we see no reason for applying the rule of estoppel by judgment in such cases. The judgment should operate as an estoppel only where the interests of the insurer and insured in defending the original action are identical—not where there is a conflict of interests. If the judgment in the original action is not binding upon the insurer or insured in a subsequent action on the issue of coverage, there would be no conflict of interests between the insurer and the insured in the sense that the insurer could gain any advantage in the original action which would accrue to it in a subsequent action in which coverage is in issue."

*Id.* at 509-11 (emphasis added; footnotes omitted). In sum, an insurer is not precluded (collaterally estopped) by the judgment in the underlying action from taking a position in a later coverage proceeding that the damages awarded in the underlying action are not covered by the insurance policy. *See Paxton-Mitchell Co. v. Royal Indemnity Co.*, 279 Or 607, 613 n 2, 569 P2d 581 (1977) (so noting).

Relying on *Ferguson*, AFM argues that its interests and Sideco's interests were in conflict with respect to coverage, and therefore it was "not bound by the facts of the underlying lawsuit," and "not bound by the factual findings assumed within the judgment." It argues therefore that "the nature of Sideco's liability" was a genuine issue of material fact that could not be decided based on the verdict in the underlying case, but was subject to being litigated anew in the subsequent proceeding. AFM contends that the trial court, in effect, precluded it from litigating Sideco's liability as a factual issue at the garnishment proceeding and thus collaterally estopped AFM, in a manner inconsistent with the holding of *Ferguson*. Although we agree with AFM's initial proposition—that there were potential conflicts between AFM and Sideco and that the rule from *Ferguson* does have application here—AFM misapprehends *how* the rule from *Ferguson* applies in this case.

At the center of this dispute is a provision in the insurance contract stating that AFM "*will pay those sums that the insured becomes legally obligated to pay as damages* because of \*\*\* 'property damage' to which this insurance applies." (Emphasis added.) What the insured is legally obligated to pay as damages can be determined only by reference to the underlying action, which determined the insured's legal obligation to pay damages. Thus, in the subsequent proceeding, the insurer is not, as AFM contends, entitled to second-guess or retry "the *nature* of Sideco's liability." (Emphasis added.) That is not, however, because it is "collaterally estopped" from doing so. Rather, that is because the subsequent proceeding requires the court to evaluate— as a matter of contract law—what, precisely, the insured has become legally obligated to pay as damages in the prior proceeding, in order to determine whether the policy covers those damages. In other words, an insurer cannot, in a subsequent proceeding, retry its insured's liability, or alter the nature of the damages awarded in that proceeding.

*Ferguson* does not suggest otherwise. *Ferguson* indicates that an insurer is not obligated to pay a judgment entered against its insured if it has not had an opportunity to litigate, on its own behalf and not as a part of its duty to defend the insured in the underlying proceeding, coverage issues such as whether an exclusion applies or whether the damages awarded are otherwise covered by the policy.[7]

---

[7] As the parties recognize, an attorney attempting to do both at the same time in the same proceeding faces not only practical but potential ethical dilemmas. *See, e.g.*, *Oregon Formal Ethics Opinion No. 2005-121* (opining that attorney hired by insurer to defend insured under reservation of rights could not ethically move for dismissal of only claim covered by insurance); *cf. Eastham v. Oregon Auto. Ins. Co.*, 273 Or 600, 607, 540 P2d 364 (1975) (in settlement negotiations in this context, insurer must give equal consideration to the conflicting interests of itself and its insured).

AFM argues on review that both the trial court and Court of Appeals decision in the present case impermissibly gave preclusive effect to the verdict in the underlying case and, in essence, would require an attorney defending an insured to try coverage issues in the underlying proceeding in a manner that is ethically problematic. We disagree. The coverage issues were not, and could not have been, tried in the underlying negligence proceeding. That the damages awarded in the underlying proceeding needed to be considered in determining coverage in the later proceeding does not in any way suggest that the coverage issues could or should have been litigated in the underlying proceeding, or that AFM was precluded from making any legal argument or presenting any evidence on a genuine issue of material fact in the garnishment proceeding.

Those matters may be litigated in a subsequent proceeding, but what is subsequently litigated is constrained by the nature of the contractual obligations between the insurer and the insured which, as noted above, here involves evaluation of what "the insured [became] legally obligated to pay as damages" in the underlying proceeding. Contrary to AFM's suggestions, what the insured became legally obligated to pay as damages in the underlying proceeding did not present a "genuine issue of material fact" for a jury to decide in the later proceeding. Rather, what the insured had become obligated to pay as damages and whether the insurer ultimately was liable under its policy presented questions of law for the court to determine by reference to (a) the contract and (b) the judgment and record in the underlying proceeding.

That is not to say, however, that the judgment in the underlying case had any preclusive effect as to factual issues and legal issues relating to insurance coverage, which brings us to our next topic of discussion—how such determinations are to be made in subsequent proceedings concerning insurance coverage.

2.  *Garnishment as a method for determining insurance obligations*

There are numerous ways that insurance litigation after an insured has become liable for damages may come before the courts. Often either the insurer or the insured seeks a declaratory judgment. *See, e.g.*, *ZRZ Realty v. Beneficial Fire and Casualty Ins.*, 349 Or 117, 241 P3d 710 (2010), *on recons*, 349 Or 657, 249 P3d 111 (2011). Sometimes such issues are raised by way of equitable claims for contribution. *See, e.g.*, *Firemen's Ins. v. St. Paul Fire Ins.*, 243 Or 10, 411 P2d 271 (1966). Sometimes, as in this case, the issue is raised by way of garnishment. *See, e.g.*, *A&T Siding, Inc. v. Capitol Specialty Ins. Corp.*, 358 Or 32, 359 P3d 1178 (2015).

ORS 18.352 provides:

"Whenever a judgment debtor has a policy of insurance covering liability, or indemnity for any injury or damage to person or property, which injury or damage constituted the cause of action in which the judgment was rendered, the amount covered by the policy of insurance shall be

subject to attachment upon the execution issued upon the judgment."

ORS 18.710(1) provides that "[a] debtor's challenge to a garnishment shall be adjudicated in a summary manner at a hearing before the court with authority over the writ of garnishment." ORS 18.782 allows for the calling of witnesses at the hearing, and provides that "[t]he proceedings against a garnishee shall be *tried by the court as upon the trial of an issue of law* between a plaintiff and defendant." (Emphasis added.)

Thus, the garnishment statutes contemplate that issues such as those presented here will be resolved by a trial to the court. AFM argues that because a garnishment proceeding is an action at law rather than in equity, a party is entitled to a jury trial on fact issues. *See* Or Const, Art I, § 17 ("In all civil cases the right of Trial by Jury shall remain inviolate."); Or Const, Art VII (Amended), § 3 ("In actions at law, where the value in controversy shall exceed $750, the right of trial by jury shall be preserved[.]"); *Horton v. OHSU*, 359 Or 168, 173, 376 P3d 998 (2016) ("Article I, section 17, guarantees a jury trial in those cases in which the right to a jury trial was customary at the time the Oregon Constitution was adopted and in cases of like nature.").

On review, AFM makes a sweeping argument that there were triable issues of fact relating to (1) what damages were caused by an "occurrence" under the policies and occurred during the policy periods; (2) whether the damages in the underlying case were "property damage" under the policies; and (3) whether various exclusions, such as the multi-unit exclusion and "one or more of the business risk exclusions," barred coverage. The first two issues, as litigated in this case, involve questions of law concerning the interpretation of the insurance policies in light of undisputed facts; we discuss them below. As for the third, concerning the applicability of various exclusions, although we agree in general that the determination of matters pertaining to exclusions often will require trying issues of fact, we need not resolve in the present case whether the trial court erroneously failed to submit any such issues to a jury. As noted above, AFM failed to assign error or make

any arguments in the Court of Appeals concerning factual issues relating to any policy exclusions, *see* 360 Or at 352, so no questions concerning policy exclusions were "properly before the Court of Appeals," ORAP 9.20, and therefore they are not properly before this court. Thus, in light of our discussions below concerning the meaning of various policy provisions and triggers of coverage, and in light of the limitation of the issue before us on review, we have no need to address whether the trial court erred in denying AFM's motion for a jury trial.

B. *Coverage Issues*

As noted, AFM raises issues concerning whether the trial court properly allocated the burden of proof, whether FountainCourt proved that the underlying judgment against Sideco was "property damage," whether FountainCourt proved an "occurrence" that triggered coverage, and whether the damages were properly allocated to AFM. We turn first to burdens of proof.

1. *Burdens of proof*

With respect to burdens of proof, the law is settled. As we noted in *ZRZ*:

> "[T]he insured * * * has the burden to prove coverage while the insurer * * * has the burden to prove an exclusion from coverage. *Compare Stanford v. American Guaranty Life Ins. Co.*, 280 Or 525, 527, 571 P2d 909 (1977) (insurer has the burden to prove an exclusion), *with Lewis v. Aetna Insurance Co.*, 264 Or 314, 316, 505 P2d 914 (1973) (insured has the burden to prove coverage)."

349 Or at 127. There is no ambiguity in how that rule applies in the present case. Both "property damage" and "occurrence," as used in the policy, relate to coverage, and thus AFM is correct that FountainCourt, standing in the shoes of the insured, had the burden of demonstrating both that Sideco had become "legally obligated to pay as damages because of * * * 'property damage,'" and that there had been an "occurrence," defined by the policy. AFM, by contrast, had the burden as to issues relating to its policy exclusions.

2.  *Property damage*

AFM contends that FountainCourt failed to establish that Sideco had become obliged to pay damages because of "property damage." The gist of AFM's argument seems to be that, under *Ferguson*, 254 Or at 510-11, the parties were not bound by the facts found by the jury in the underlying trial, and at most, FountainCourt established a mere possibility that the damages found by the jury were for "property damage" as defined in the insurance policies. In particular, AFM argues that the damages found by the jury in the underlying proceeding are not "property damage" as defined in the insurance policy, because the damages in the underlying proceeding could have included the costs of repairing "defective work" by Sideco, and "defective work" does not constitute property damage (citing *Wyoming Sawmills v. Transportation Ins. Co.*, 282 Or 401, 578 P2d 1253 (1978)).

As explained above, *Ferguson* does not require a court resolving an insurance coverage issue to disregard the nature of the damage award in the underlying action. Indeed, given that the coverage generally is based on the "sums the insured becomes legally obligated to pay as damages" because of property damage, the damage award in the underlying proceeding is a key to resolution of the coverage issue. 360 Or at 357. The policies at issue here define property damage as "[p]hysical injury to tangible property." In this case, as noted, the only claim that went to the jury with respect to Sideco concerned property damage, and the jury was instructed that FountainCourt was required to "prove *physical damage* to their property," and that the "measure of damages for partial destruction of real property is the reasonable cost of repairing *damaged* property." 360 Or at 346 (emphasis added). The jury was not instructed that it could award damages for "defective work"—it was instructed it could award damages for "physical damage." Contrary to AFM's urging, *Wyoming Sawmills* does not stand for the proposition that actual physical damage to property is not covered under an insurance policy merely because it may be associated with defective workmanship by an insured. Rather, that case addressed whether "intangible" damage such as "depreciation in value" fell within the meaning of

"physical damage" as used in an insurance policy. 282 Or at 406. This court held that "in the absence of a showing that any physical damage was caused to the rest of the building by the defective studs and that the labor cost was for the rectification of any such damage, plaintiff cannot recover." *Id.* at 406-07. Here, in contrast to *Wyoming Sawmills*, the jury awarded damages based on Sideco's negligence that caused *physical* damage to the FountainCourt buildings. *See id.* at 407 ("We do not hold that if damage was occasioned to any part of the building [other than the defective studs] such damage is not covered."). This case was tried to the jury on the theory that Sideco's negligence had caused physical damage to property. We find no significant legal distinction between physical damage to property as awarded in the underlying case and "physical injury to tangible property" as used in the insurance contracts.[8] The trial court did not err in determining, as a matter of law based on interpretation of the insurance contracts, that the sum that Sideco became legally obligated to pay as damages in the underlying action were for "property damage."

3.  *Trigger of coverage*

That brings us to AFM's argument that FountainCourt was obligated to, but could not, establish that the damage was caused by an "occurrence" within the periods covered by the AFM policies. As noted, both parties took the position at the garnishment hearing that the water damage at issue here is cumulative, and that it was not possible to determine how much of it had occurred during what policy periods. We do not understand AFM to be contending otherwise on appeal. Rather, it argues that Oregon follows an injury-in-fact rule for the triggering of coverage, that FountainCourt failed to prove "based on facts in evidence at the trial" the amount of damages that occurred between May 1, 2004 and May 1, 2006, when the AFM policies were in effect, and that therefore coverage was not triggered. As

---

[8] Much of AFM's argument in regard to "property damage" appears to be based more on what is in the *exclusions* found in its policies, rather than the definitions. However, as noted, the insurer bears the burden of establishing that an exclusion applies, and AFM neither assigned error nor argued on appeal that the trial court had erred in concluding that it failed to meet its burden with respect to exclusions.

explained below, AFM is incorrect about how trigger-of-coverage issues are analyzed in cases such as this involving continuous damage that occurs over the course of multiple policy periods.

In *St. Paul Fire v. McCormick & Baxter Creosoting*, 324 Or 184, 923 P2d 1200 (1996), this court addressed trigger-of-coverage issues concerning a number of general comprehensive liability insurance policies, in the context of deciding an insurance dispute about environmental damage to real property that occurred over the course of several decades. Several of those policies used the terms "occur" and "occurrence" in a manner similar to the policy at issue here. *Id.* at 194-95, 197-99, 200. The damage in that case had been discovered in the 1970s, and the question presented was whether coverage was triggered under any or all of the pre-1970 insurance policies. The insurers argued that coverage was not triggered until the damage was discovered. This court rejected that argument:

> "The operative phrase in the trigger clauses contained in the caused-by-accident policies is 'during the policy period.' The common meaning of 'during' is 'at some point in the course of.' *Webster's Third New Int'l Dictionary* 703 (unabridged ed 1993). The trigger clause states that, if an insurable event—*i.e.*, an accident—happens at some point in the course of the policy period, then that event is covered. There is no wording in the pertinent policies that would support the insurers' reading, and the insurers that issued the caused-by-accident policies point to none.

> "* * * * *

> "[Various policies from the 1960s] contain definitions of 'occurrence' that provide that an occurrence has taken place if there is '*direct injury to or destruction of tangible property* during the policy period.' (Emphasis added.) Those words are unambiguous. If property is injured during the policy period, there has been an 'occurrence,' and coverage under the policy is triggered."

324 Or at 201 (emphasis in original). The court stated that "[t]he policies do not make an 'occurrence' depend on the fixing of financial responsibility, or damages." *Id.* The court therefore concluded that those insurers were not entitled to

summary judgment on the ground that their policies had not been "triggered." *Id.* at 202. Implicit in this court's holding was that, although the damage at issue there had begun to occur before the policies were in effect, and continued to occur after the policies were no longer in effect, coverage under those policies was nonetheless "triggered" because the damage was ongoing during the policy periods.

That conclusion comports not only with the policy language at issue in *St. Paul Fire*,[9] but also with the decisions of most other courts that have considered the issue, as well as treatises discussing this topic. *See, e.g.*, Allan D. Windt, *Insurance Claims and Disputes* § 11.4, 11-102 (6th ed 2013) ("The correct answer, and the rule in the vast majority of the courts to have addressed the issue, is that coverage is triggered from the date of the first latent injury/damage and continues to be triggered at least until the date the injury/damage first becomes manifest."); *id.* § 11.4 at 11-107 ("[W]hen there is an ongoing process of property damage or bodily injury, every policy period in effect during the ongoing damage/injury process provides coverage."); *cf.* Lee R. Russ and Thomas F. Segalla, 15 *Couch on Insurance* § 220:26 (3d ed 2005) ("in continuous trigger cases, insurers face liability up to their respective per-occurrence limits for separate occurrence for each triggered policy year in which they were on the risk").

AFM does not seriously dispute that there was proof that *some* property damage did occur during the time its policies were in effect. Indeed, both parties provided expert opinion that supported that conclusion. Rather, AFM's position has been that, because FountainCourt had the burden of demonstrating an "occurrence" during the policy period, it necessarily was required to demonstrate the amount of damage that occurred during the policy period. That position is inconsistent with our holding in *St. Paul Fire*, and it appears to be at odds with the provision in the policies indicating that property damage not known to the insured

---

[9] The policies at issue here similarly support such an interpretation. *See, e.g.*, 360 Or at 349 ("'[P]roperty damage' which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured *** includes any continuation, change or resumption of that 'bodily injury' or 'property damage' after the end of the policy period.").

prior to the policy period "*includes any continuation*, change or resumption of that 'bodily injury' or 'property damage' *after the end of the policy period*." 360 Or at 349 (emphasis added).[10] In sum, no genuine issue of material fact needed to be resolved at the garnishment proceeding concerning whether at least some property damage occurred when the AFM policies were in effect. The court correctly rejected, as a matter of law, AFM's arguments that FountainCourt was required to prove the precise amount of damages that occurred during the policy period in order to demonstrate that there had been an "occurrence" that triggered coverage under the policies.

### 4.   *Allocation of liability among multiple insurers*

Inherent in many of AFM's arguments in this court is an assumption that, because it insured Sideco for only a portion of the time that the damage was occurring, it cannot be held liable for the entire amount that Sideco is legally obliged to pay to FountainCourt. As described above, AFM's primary position throughout this litigation has been that it has no liability at all. However, AFM also suggests at least implicitly in its arguments to this court that any liability that it has should not be for the full amount of damages that Sideco owes to FountainCourt. Whatever the abstract merits of AFM's assumption might be, the fact is that AFM did not argue at the garnishment proceeding about how, if it were found to be liable for damages awarded to FountainCourt against Sideco, such damages should be allocated among policy periods and/or multiple potentially responsible parties. It did not argue in the trial court, or in the Court of Appeals, that it might be liable for some but not all of the damages. In this court, as noted above, see

---

[10] AFM's position also is inconsistent with the following observation from Windt 3 *Insurance Claims and Disputes* § 11.4 at 11-107-08, that

"when there is an ongoing process of property damage or bodily injury, every policy period in effect during the ongoing injury process provides coverage. The burden should be on the insured to prove that there was, in fact, such injury/damage during the policy period. The insured should also have the burden of quantifying such injury/damage, *unless (i) the issue is how to allocate the injury/damage among policies covering consecutive policy periods, or (ii) quantification is impossible.*"

(Emphasis added; citations omitted.)

360 Or at 353 n 6, AFM described this case as "involving some damage that is payable by an insurer and some damage that is not." That framing of the issue led to the parties and various *amici* raising questions and making arguments about how liability should be allocated in situations where multiple insurers may be potentially liable.

In situations such as this, where it is not possible, as a matter of proof, to quantify how much continuous damage took place during specific policy periods, courts have resolved the question by reference to policy provisions, or when a policy does not contain specific provisions about allocation among insurers, by adopting a judicially created method of allocation. "Because in these types of cases it is virtually impossible to allocate to each policy the liability for injuries occurring only within its policy period, the courts are left with the nettlesome problem of how to allocate damages among the policies." Russ and Segalla, 15 *Couch on Insurance* § 220:25. Most of the courts that have addressed this problem have taken one of two possible approaches: One is often referred to as the "all sums" approach, and the other is often called the "pro rata" approach.[11] AFM has

_____

[11] The "all sums" approach is exemplified by *Keene Corp. v. Insurance Co. of North America*, 667 F2d 1034, 1047 (DC Cir 1981), which involved asbestos exposure over a long period of time:

"The policies at issue in this case provide that the insurance company will pay on behalf of [its insured] 'all sums' that [the insured] becomes legally obligated to pay as damages because of bodily injury during the policy period. *** [When the insured was] held liable for an asbestos-related disease, only part of the disease will have developed during any single policy period. The rest of the development may have occurred during another policy period or during a period in which [the insured] had no insurance. The issue that arises is whether an insurer is liable in full, or in part, for [the insured's] liability once coverage is triggered. We conclude that the insurer is liable in full, subject to [policy provisions relating to other insurance]."

The court in that case further noted: "There is nothing in the policies that provides for a reduction of the insured's liability if an injury occurs only in part during a policy period." *Id.* at 1048. The court observed that the policies "do not distinguish between injury that is caused by occurrences that continue to transpire over a long period of time and more common types of injury. Nor do the policies provide that 'injury' must occur entirely during the policy period for full indemnity to be provided." *Id.* at 1049 (footnote omitted). *See also* Russ and Segalla, 15 *Couch on Insurance* § 220.27 (citing cases following the "all sums" approach).

The "pro rata" approach, by contrast, takes into account the span of time over which the damage occurred, then allocates to each insurer a portion of the liability based on how much of that time that insurer's policy was in effect. This

never taken the position in this litigation that Oregon courts should eschew the "all sums" approach in favor of a "pro rata" approach, or vice versa. Rather, it has taken the position that neither approach is consistent with Oregon law because in this circumstance, an insured is unable to demonstrate that there is coverage at all. That is, AFM's position has been that, in cases in which damage occurs over a number of years, and spans different insurance policies, and no way exists to pinpoint what amount of damage occurred at what point in time, the insured cannot establish that coverage has been triggered. As we explained above, 360 Or at 364-65, we disagree with the premise of that argument, *i.e.*, that coverage was not triggered if it is impossible for an insured to demonstrate how much damage occurred during a policy period.

It appears that the trial court implicitly did apply some variation of the "all sums" approach in this case. That is, the trial court concluded that FountainCourt had established that the AFM policies had been triggered—property damage had occurred during the AFM policy periods. It also concluded that the Clarendon policy had been triggered, but that Clarendon had met its burden to establish that it nonetheless was not liable because the damages fell within a policy exclusion. By entering judgment against AFM for the entire unpaid amount of the underlying judgment against Sideco, the court implicitly concluded that AFM was responsible for the entire amount and not a prorated amount, although some of the damage necessarily had occurred when the Clarendon policy was in effect, given the court's conclusion that that policy was triggered. The trial court's conclusion appears to be consistent with *Cascade Corp. v.*

approach was explained in *Boston Gas Co. v. Century Indem. Co.*, 454 Mass 337, 361, 910 NE2d 290 (2009), as consistent with the "occurrence" definitions in the policies at issue in that case, and superior, to the "all sums" approach as a matter of policy, because the "all sums" approach does not solve the problem of allocation among insurers, but merely postpones it, leaving it to be decided in a subsequent action for contribution. The "pro rata" approach is premised on the notion that an insurer should be responsible for the amount of damage that took place during its policy period. *See generally* Windt, 2 *Insurance Claims and Disputes* § 6.47 ("If *** the covered damages cannot, as a practical matter, be allocated to one particular policy period as opposed to another, the damages should ultimately be allocated among the solvent insurers based upon the period of time each insurer covered the ongoing damage.").

*American Home Assurance Co.*, 206 Or App 1, 8-10, 135 P3d 450 (2006), *rev dismissed*, 342 Or 645 (2007). In that case, the Court of Appeals, in a somewhat analogous context concerning liability of multiple excess insurers, indicated that, while a pro rata approach was suitable in determining allocation among insurers in contribution actions, it did not provide a basis for reducing the insurer's liability to its insured.

AFM did not raise any issue in the Court of Appeals in the present case that the trial court erred in taking that approach. Nor did the Court of Appeals decide any such issue, but in fact, specifically determined that it "need not reach that question." *FountainCourt*, 264 Or App at 488 n 12. Thus, while the "all sums" rule was implicated here in that the trial court's judgment appears to have embodied that approach, the propriety of the trial court doing so was not preserved for our review, and we decline to address it.[12]

### III.    CONCLUSION

To summarize, no genuine issue of material fact was presented by the parties at the garnishment hearing about whether some property damage to FountainCourt's buildings occurred during the AFM's policy periods due to Sideco's negligence. The "genuine issues of material fact" that AFM urged in the trial court concerned (1) what damage occurred during the policy periods, and (2) whether "property damage" under the policies differed in some legally significant way from the property damage for which Sideco had been held liable in the underlying proceeding. As to the first question, AFM's casting of the timing-of-damage issue as a genuine issue of material fact on which FountainCourt bore the burden of proof was based on AFM's mischaracterization of the policy as barring coverage of any damages that fell outside of the policy periods, and on its erroneous assumption that an insured in this situation is required to demonstrate

---

[12] We emphasize that the application of an "all sums" or "pro rata" approach to determining liability is not simply an abstract question of insurance law, but often is a matter that must be determined based on the language of the insurance policies at issue, when such issues are properly raised by the parties. Neither party in the present case has made any argument about how specific policy provisions, such as the provision quoted above concerning "continuation" of property damage "after the end of the policy period," might affect such an analysis. 360 Or at 349.

the precise amount of damage that occurred at a given time in order to establish that there has been an "occurrence" that triggered coverage. As explained above, the legal premises of both of those arguments are flawed. As to the second question, the trial court properly addressed it as a question of law, requiring it to interpret the policies' provisions in light of the judgment and record from the underlying proceeding. Given the manner in which AFM chose to litigate this case at the garnishment proceeding and in the Court of Appeals, and given the limited scope of the issues before us on review, we conclude that the trial court and the Court of Appeals correctly rejected AFM's arguments as a matter of law.

The decision of the Court of Appeals is affirmed. The supplemental judgment for garnishment is affirmed. The supplemental judgment awarding attorney fees, costs, and disbursements is reversed as to the attorney fee award and is otherwise affirmed.